Filed 9/10/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALEXANDER BARKER,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>FOX & ASSOCIATES et al.,<br><br>     Defendants and Appellants | A142373<br><br>(Sonoma County<br>Super. Ct. No. SCV254608) |

Alexander Barker sued three defendants for defamation and intentional and negligent infliction of emotional distress. Defendants filed an anti-SLAPP motion to dismiss. The trial court denied the motion, concluding that Barker had met his burden under step two of the anti-SLAPP analysis. We review the issue de novo, and conclude otherwise, that Barker has not met his burden to show that his complaint is legally sufficient and supported by a sufficient prima facie showing to support a favorable judgment. We thus reverse.

## BACKGROUND

### The Factual Setting

An understanding of the factual background predating Barker's complaint is necessary to put the matter in context, and we begin with that background.

Allison McBride (Allison), an elderly woman, suffered from dementia for many years. Allison had two daughters, Lucy McBride Olsen (Olsen) and Cameron Volker (Volker).[1]

---

[1] We refer to some parties by first names, and others by last names, to be consistent with the briefing.

For several years, a dedicated team of paid caregivers—described by Olsen as "loving friends who knew [Allison] and cared for her deeply"—tended to Allison's care; the team was called "Allison's Angels." As described in Barker's brief, Diane Senia, a longtime friend of Allison "for many years had undertaken the role of arranging Allison's nursing care. [Citation.] Over a thirteen plus year relationship, Ms. Senia gained substantial knowledge concerning Allison's care. [Citation.] In fact, Ms. Senia has authored two manuals on the subject, including a manual entitled Allison's Angels Handbook, which details how to properly care for Allison, including hygiene protocol." Barker was one of Allison's Angels who cared for Allison for some three and one-half years. Nancy Barker (Nancy), Barker's mother, was another.

At some point, a rift developed between Allison's daughters, who could not agree on all aspects of their mother's care. They agreed to submit to voluntary mediation, the upshot of which was an agreement to the appointment of a conservator. And on November 14, 2012, the Sonoma County Superior Court entered an "Order on Stipulation and Agreement" appointing Deborah L. Wagner (Wagner) conservator of the person and estate of Allison. That order provided in part as follows: "Ms. Wagner shall provide Cameron McBride Volker and Lucy McBride Olsen with weekly reports regarding the health and care of Allison Burns McBride, which reports shall address issues relating to the previous week and events and appointments upcoming in the next week. Mrs. McBride's residence and caregiving arrangement as of October 16, 2012, shall not be changed so long as such residence and care plan is in the best interest of Mrs. McBride, as determined by the Conservator of the Person."

Wagner retained many, if not all, of Allison's Angels, including Barker and Nancy. But Wagner also made a number of changes to Allison's care, including, for example, recommending that caregivers move into Allison's home during their shifts because she needed closer monitoring as her health deteriorated. Wagner also began paying Allison's caregivers legitimately and reporting their wages as employees.

One other thing Wagner did was to hire Cheryl Fox (Fox) to act as Allison's case manager. Fox is a registered nurse and the President and CEO of Fox & Associates (Fox

2

& Associates), which employs nurses and healthcare professionals to provide case management and advocacy services for homebound clients.

The significance—and effect—of Wagner's practices was the subject of disagreement, and we quote from two of the declarations filed below. As Wagner put it: Barker "was part of a team of caregivers already in place, and caring for Ms. McBride, when I was appointed conservator. His mother, Nancy Barker, was also one of Ms. McBride's caregivers. None of the caregivers were nurses. In fact, these individuals were friends and associates in the community that Ms. McBride's relatives had assembled to provide round the clock care for her. They all cared about Ms. McBride and felt close to her, and I wanted them to be able to continue working for Ms. McBride if it served her best interests.

"5. To ensure a proper assessment of Ms. McBride's situation and proper ongoing care, I retained Fox & Associates to act as case manager for Ms. McBride. I was familiar with Fox & Associates prior to engaging them for Ms. McBride, and I felt (and feel) very confident that their professional knowledge, experience, and approach to home health care meets the best interests of Ms. McBride.

"6. Fox & Associates performed an initial needs and safety evaluation for Ms. McBride. They determined that she required nursing oversight, as none of the caregivers working for her had any background or training in nursing or home healthcare. . . ."

Allison's daughter Olsen saw it this way:

"3. For many years, Diane Senia has helped me by organizing and training a team of caregivers (nicknamed the Angels by Diane) for my mother. The quality of care that has been provided by the angels is truly exceptional. My mother's care givers were not strangers but loving friends who knew and cared for her deeply. They worked so well as a team because they listened to one another and taught one another and had regular meetings to brainstorm together on how to best meet my mother's ever changing needs.

"4. Despite the fact that both Cameron and I were more than satisfied with our mother's caregivers and despite the fact that the Court ordered no change in the status of

3

caregiving, Deborah Wagner decided that she would take shifts away from the current caregivers and fill those shifts with employees from Fox and Associates. . . .

"5.     Diane Senia and I tried to explain to Deborah Wagner and Cheryl Fox and Allison's best interests would be served by allowing Allison to be cared for by her existing care givers who all knew and loved Allison as Allison knew them and loved them.  Both Diane Senia and I told Deborah and Cheryl that Allison can become combative with strangers.  I explained that Allison has a history of fighting against new caregivers who are not properly and slowly trained and introduced.  Our protocol previously for introducing new caregivers included extensive trainings, shadowings, short shifts to build up competence and a careful assessment of Allison's willingness to be cared for by a particular person.

"6.     Despite the fact that Allison was both safe and happy with her existing caregivers, Deborah Wagner insisted on having shifts covered by employees from Fox and Associates."

Suffice it to say that Wagner's entry in to the picture caused some concern, and perhaps friction.  And then came the incident leading to the litigation here:  on June 21, 2013, while being tended to by Carly Newell, an employee of Fox, Allison "became combative and a quarrel resulted," causing injuries to Allison.

On June 24, Olsen sent Wagner a lengthy e-mail which, as Olsen described it, expressed her "concern about the fact that [an Allison Angel] had arrived to find [Allison] covered with bruises and emotionally distraught."

The next day, Olsen received a copy of an e-mail sent by Fox to Wagner, which e-mail provided in its entirety as follows:

"Good Afternoon,

"I made a site visit to see Allison at her home today with Deborah.  Angel Nancy was caring for Allison who is in a great mood busy making beautiful cards.

"I took a look at Allison's arms that showed she had superficial bruising on both arms, that is in varied states of healing.  There are no skin tears, that are apparent.

4

"Discussion with Nancy was quite good. We did some game planning on how to improve the current situation when new caregivers come on board, including Carly.

"As I understand, there was a list of items discussed with Alex prior to Carly's orientation. The expectation was that Alex would orient Carly to the fullest degree possible and address each of the items on the list. However, none of the items were addressed. Therefore for reasons not yet clear to me, Carly was placed in a situation ill prepared to fully understand and have knowledge to addressing Allison's needs.

"I am in the process of arranging for Carly to spend extended time this weekend with Patty, and next week with Nancy so that the orientation process is more fully completed to best serve Allison. Carly will then be covering the every other Sunday slot and back up as needed."

There were six other "cc" recipients of Fox's e-mail besides Olsen: Allison's other daughter; Wagner's attorney; two employees of Fox & Associates; and two of Allison's Angels, one of whom was Nancy.

Fox's e-mail was sent at 4:23 p.m. on June 25.

At 8:17 p.m. that evening, Barker's mother Nancy sent an e-mail to Fox. It read as follows: "I find it pretty interesting that the person you are throwing under the bus is not CC'd on this email. Yes we had a cordial visit today from Deborah and Cheryl. And yes Allison was in a wonderful mood, because she was with someone that she has known and trusted and has built a relationship with for the past 5 years. I introduced our guests as 'good friends' which helps Allison feel safe. [¶] What Carly doesn't have is a relationship and the trust of Allison as well as experience with her to know how to interact with Allison—That is something that only can happen in time. We have all tried to get Fox to understand this. Yet you still went ahead and put Carly in a position that no human could have handled. All at Allison's expense. [¶] I am most frustrated that instead of being accountable you are choosing to place the blame on us."

Eighteen minutes later, Wagner responded to Nancy with this e-mail:

"I am a little shocked at this response.

5

"When time permits we can discuss. I believe at times caregivers need some input and feedback on various issues. Alex was not cc'd, as he is not going to be a caregiver of choice at this time to interact with the training. Not because we don't like him; because you and Patty have the most experience to provide to Carly. He did not follow-thru with the instructions given him by Cindra and this causes us to take pause.

"We are happy to discuss this on a personal basis. I do not feel it is appropriate to share this with all and we are certainly not throwing him under the bus; however since you felt all need to know I am going to include them in this response.

"It is apparent I should have held back with you today regarding Alex as I see it is too close for your [*sic*] to separate the issues. I am truly sorry you feel this way and encourage you to give me or Cheryl a call.

"We had such good feelings about our visit today; however I can see it was not so for you, although you did not express this while we were there. Please feel free to contact me or Cheryl. I will be in court at 8am tomorrow; should be done by 9:45 and can talk in transit to my destination. I feel you have taken this too personally; that was not the intent.

"Our first priority is to Allison and I know the most recent changes have been some what challenging for everyone, but felt you of all were the most helpful with assisting us with the changes. Again, this is not personal. We look at each and every caregiver and we evaluate the situation and determine where we need to work with and provide additional feedback/training. We are grateful or [*sic*] all of your experience and hope you pass this on to Carly. From time to time we all need a reminder of what we do and how we do it. This can be a good thing.

"We are so appreciative for what everyone does for Allison; sometimes we see things others may not and we are here to provide support and feedback etc.

"I look forward to speaking with you and clarifying the intent."

In July 2013, Wagner, along with one of the nurses from Fox & Associates, met individually with each of the four caregivers for Allison, and discussed the action plan for Allison's care. In late July, Wagner and a nurse met with Barker, and reviewed and

discussed with him the action plan, which he signed. Wagner also provided Barker with a letter explaining that, due to her concerns, she was placing him on a 30-day probation, during which he would continue work at full pay. As described in the letter, Barker would be provided additional training and materials to improve his caregiving services for Allison, and Wagner would follow up in a month. Barker also signed that letter.

The following week, Barker called in sick, and then quit.[2]

**The Proceedings Below**

On November 12, 2013, Barker filed a complaint for damages. It named three defendants, Wagner, Fox, and Fox & Associates (when referred to collectively, defendants). The complaint alleged three causes of action: (1) defamation; (2) intentional infliction of emotional distress; and (3) negligent infliction of emotional distress. The full extent of Barker's claim for defamation was as follows:

"4. At all times herein mentioned, plaintiff Alex Barker was a caregiver and resides in the County of Sonoma, State of California. Plaintiff has at all times enjoyed a good reputation both generally and in his occupation.

"5. For several years, Alex Barker was working as a caregiver for Allison McBride. Allison McBride is an elderly woman who suffers from dementia. Allison McBride has a team of caregivers; Alex Barker was one member of the team.

"6. Beginning in June of 2013, defendants began publishing e-mails that contained false and defamatory statements about plaintiff Alex Barker. These e-mails were and are libelous because they falsely claimed that Alex Barker was responsible for severe bruising and physical and mental injuries suffered by Allison McBride.

"7. The true facts are that Alex Barker was not responsible in any way for the injuries suffered by Allison McBride. The injuries suffered by Allison McBride resulted from the incompetence and poor planning by both Cheryl Fox and Deborah Wagner.

_____

[2] Thereafter, Barker applied for unemployment benefits, apparently without success. According to Wagner, she learned of Barker's claim because she was responsible for receiving and reviewing all of Allison's mail. She personally received a notice from the Employment Development Department indicating that it would take no action on Barker's claim as it had been determined to be invalid.

7

Deborah Wagner and Cheryl Fox then attempted to misdirect blame from themselves by sending out numerous false and libelous e-mails. These e-mails were sent to and read by numerous people. These e-mails falsely claimed that Alex Barker was responsible for injuries suffered by Allison McBride.

"8. These e-mails exposed plaintiff Alex Barker to hatred, contempt, ridicule, shame, mortification, misery, and obloquy because they blamed plaintiff Alex Barker for causing injuries to a helpless and elderly woman who suffers from dementia. Plaintiff Alex Barker was severely hurt by these false statements because he has sincere respect and strong feelings of affection for Allison McBride and he has prided himself on providing quality care for her.

"9. In addition to publishing libelous e-mails about Alex Barker, Defendants also orally slandered Alex Barker by stating to other people that Alex Barker had tampered with the video camera and/or video camera footage that should have captured the activities concerning Allison McBride.

"10. The written and oral defamation made by Defendants about Alex Barker included express and implied accusations that Plaintiff violated company policies; that he was a poor performer; that he deserved written warnings and disciplinary actions against him; that he was incompetent; a troublemaker; that he was responsible for causing serious physical injury to Allison McBride; and that he was dishonest. These and other similar false statements were in violation of Civil Code Sections 45 and 46(3)(5).

"11. None of the Defendants' defamatory publications against Plaintiff referenced above are true.

"12. Each of the publications by Defendants were made with knowledge that no investigation supported the unsubstantiated and obviously false statements. The Defendants published these statements knowing them to be false, unsubstantiated by any reasonable investigation. These acts were known by Defendants and each of them to be negligent to such a degree as to be reckless. In fact, not only did Defendants, and each of them, have no reasonable basis to believe these statements, but they also had no belief in the truth of these statements, and in fact knew the statements to be false.

8

"13.    As a proximate result of the above-described publications, plaintiff has suffered loss of his reputation, shame, mortification, and hurt feelings all to his general damage in a sum according to proof."

As is apparent, and despite the settled pleading rules, at no point did Barker allege what he claimed to be the specific defamatory communications.  (*Lipman v. Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 235 [plaintiff alleging defamation must set forth "either the specific words or the substance of" the allegedly defamatory statements].)  An allegation "of a 'provably false factual assertion,' . . . is indispensable to any claim for defamation."  (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 32.)[3]

The emotional distress causes of action simply incorporated the earlier paragraphs.

On February 4, 2014, represented by a single law firm, defendants filed a motion to strike under Code of Civil Procedure section 425.16 (motion or anti-SLAPP motion),[4] set for hearing on April 16, 2014.  The motion was accompanied by a memorandum of points and authorities; the declarations of Wagner and Fox, both with exhibits; and a request for judicial notice, requesting notice of two documents in the conservatorship proceeding.

As to the defamation claim, the table of contents in the memorandum of points and authorities supporting the motion stated as follows:

"A.  Defendant's Statements Constitute Protected Activity . . .

"B.  There is No Probability Plaintiff Would Prevail in this Action if it Were Allowed to Go Forward . . .

---

[3] As Witkin distills the pleading rule, "It is sometimes said to be a requirement, and it certainly is the common practice, to plead the exact words or the picture or other defamatory matter.  The chief reason appears to be that the court must determine, as a question of law, whether the defamatory matter is on its face or capable of the defamatory meaning attributed to it by the innuendo.  Hence, the complaint should set the matter out verbatim, either in the body or as an attached exhibit."  (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 739, p. 159.)

[4] Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

"1.  Defendants' Statements Are Privileged Pursuant to Civil Code 47(c) . . .

"2.  Plaintiff Fails to Set Forth a Prima Facie Case for Defamation . . . ."

And in the course of the argument, the motion said this:

"Most notably, in asserting a claim for defamation, the plaintiff must allege that the defendant's statements were false.  In opposing an anti-SLAPP motion, the plaintiff's burden is heightened, to include the requirement that he present facts sufficient to support these allegations.  If those facts do not serve to defeat the evidence presented by Defendants' anti-SLAPP, the complaint must be stricken.

"Plaintiff alleges that Defendants sent 'numerous' emails broadcast to, and read by, multiple individuals.  He says 'they falsely claimed that Alex Barker was responsible for severe bruising and physical and mental injuries suffered by Allison McBride.'  He further alleges that 'the written and oral defamation made by Defendants about Alex Barker included express and implied accusations that Plaintiff violated company policies; that he was a poor performer, that he deserved written warnings and disciplinary actions against him; the [*sic*] he was incompetent; a troublemaker; that he was responsible for causing serious physical injury to Allison McBride; and that he was dishonest.'

"However, Defendants never said those things; and the emails do not exist.[]  What *does* exist is the July 26, 2013 letter from Wagner to Plaintiff in which she indicated her concerns about Plaintiff's work performance, and placed him on probation.  She then indicated he would be provided with training and materials, and she defined the timeline for follow-up.  Plaintiff reviewed the Action Plan and the letter in his meeting with Wagner that day, and he *signed* both.

"In short, Defendants are professionals with an obligation both to Ms. McBride, and to the Court.  They have provided their sworn statements of fact.  They have also provided their communications and documents to this Court, and by way of their declarations have established the basis for their admissibility.  For his part, Plaintiff's defamation claim relies on allegations which, when pierced even at the surface level, collapse under their own fabrication.  Moreover, upon reviewing the statements

10

Defendants *did* make, this Court will find that Plaintiff cannot establish they were false, and therefore, they are not actionable as defamation.

"Additionally, Plaintiff must allege and support the element of damages in order to advance his defamation cause of action. However, as the evidence shows, following his July 26th meeting with Wagner, Plaintiff failed to show up for work, and subsequently quit. He then made a claim for unemployment benefits to which he was not entitled. Upon rejection for those benefits by the Employment Development Department, Plaintiff sued Defendants seeking, among other things, $15,000 in 'lost income' to date, as well as $250,000 in general damages. Defendant was not fired. His hours and pay were not reduced. He does not bring a claim for wrongful termination, or even for constructive termination. Plaintiff abandoned his job, apparently under some misunderstanding that he could collect unemployment benefits. When that failed, he sued Defendants for the lost income he, alone, deprived himself of.

"By way of Plaintiff's allegations, and the evidence admissible in connection with this motion, Plaintiff has failed to even set forth a prima facie case for defamation. It is, therefore, axiomatic that he cannot meet his present burden of demonstrating a likelihood of prevailing on that claim."

On April 3, Barker filed his opposition to the motion. The opposition was brief, nine pages, and made three substantive arguments: (1) statements made with malice are not privileged under Civil Code section 47(c); (2) even if the common interest privilege applied, the publication went beyond the group interest; and (3) Barker need make only a minimal showing he will prevail.[5] Interestingly, Barker's opposition did not even mention his claims for emotional distress.

Barker's opposition was accompanied by eight declarations, those of: himself; his attorney; Olsen; four of Allison's Angels; and Ruth Tonascia, who was apparently involved in some litigation with Wagner as the conservator of Tonascia's mother. Barker also filed his own request for judicial notice. Some of the declarations filed in Barker's

---

[5] Barker also argued that the motion was frivolous, subjecting defendants to attorney fees.

11

opposition were lengthy, two of them over 30 pages (including exhibits), and two others over 15 pages.

On April 10, defendants filed their reply to Barker's opposition. That reply began with this assertion: "Plaintiff's Opposition to Defendants' Special Motion to Strike (anti-SLAPP Motion) takes up 136 pages, and includes seven declarations, with all manner of exhibits. Most of the averments are inadmissible: as hearsay, lacking foundation, speculative, conclusory, and even demonstrably false.[] More to the point, the vast bulk of the opposition is completely irrelevant in meeting Plaintiff's burdens on this Motion. Rather than addressing the points and authorities raised in Defendants' moving papers, Plaintiff launches a bizarrely misguided attack of Defendants' handling of the separate Conservatorship matter for Allison McBride, which falls under the jurisdiction and continuing review of the Probate department of this Court."

Defendants' reply also included 16 pages of objections to evidence, objecting on various grounds to much of the content in the declarations in Barker's opposition.

The motion came on for hearing on April 16, prior to which the court had issued a tentative ruling. At the hearing, defendants argued among other things the absolute privilege of Civil Code section 47(b), an argument that had not been made in their papers.

On May 6, the court entered its order denying the motion to strike. The order concluded with this:

"The result is that the evidence presented shows that while the statements and conduct at issue might be within the ambit of the qualified privilege of Civil Code section 47, because clearly by and to a 'person interested' in the information, it is not clear that the statements are privileged. The circumstances indicate, through a sufficient showing, that the statements may well have been false, intentional, and malicious just as Plaintiff alleges. Any other, more direct, evidence of malice, i.e., Defendants' animus, is unlikely to be available now, if ever.

"Considering all evidence, the court concludes that, while the statements and conduct at issue might be within the ambit of the qualified privilege of Civil Code section 47, it is not clear that the statements are privileged. The circumstances indicate that the

12

statements may well have been false, intentional, and malicious just as alleged by Plaintiff. As such, at least at this juncture, the privilege does not necessarily bar Plaintiff's claims.

"Aside from the privilege, Defendants argue that the allegations are not even true. They do provide evidence supporting this position, but Plaintiff also provides evidence that disputes this and supports his allegations. This is sufficient for purposes of this motion.

"The evidence presented is sufficient to demonstrate a probability of success since it supports the veracity of the allegations in the complaint, including the claim that Defendants made the alleged false statements to a variety of people and that they in fact did so to cover up their own errors, while the circumstances may support the finding that Defendants' statements and conduct were therefore malicious."

The order did not address any of the objections to evidence. And curiously, the order did not even mention, much less discuss, Barker's claims for intentional and negligent infliction of emotional distress.

Defendants filed a timely appeal.[6]

## DISCUSSION

### Anti-SLAPP Law and the Standard of Review

Subdivision (b)(1) of section 425.16 provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Subdivision (e) of section 425.16 elaborates the four types of acts within the ambit of a SLAPP.

---

[6] Unlike the situation in the trial court, where all three defendants were represented by one firm, on appeal Wagner has counsel separate from Fox and Fox & Associates. Wagner's position on appeal is essentially a "joinder" in the brief of the other two appellants, going on to briefly "emphasize" some points.

13

A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

Defendants essentially contended that the utterances about which Barker complained were in connection with the conservatorship set up by the Superior Court, and thus protected activity. Barker did not take issue with this in his opposition, essentially conceding the point. And the trial court assumed defendants had met step one of the SLAPP analysis, and analyzed the motion only under step two.

Barker does not contest the point on appeal, and the parties' briefing addresses only step two. So, too, will our analysis, an analysis we make on de novo review. (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988 (*Grewal*).)

As to what the analysis entails, we confirmed it in *Grewal, supra,* 191 Cal.App.4th at p. 989: "We decide the second step of the anti-SLAPP analysis on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).) Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.' (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.) [¶] That is the setting in which we determine whether plaintiff has met the required showing, a showing that is 'not high.' (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra,* 151 Cal.App.4th at p. 699.) In the words of the Supreme Court, plaintiff needs to show only a 'minimum level of legal sufficiency and triability.' (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5.) In the words of other courts, plaintiff needs to show only a case of 'minimal

merit.' (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675, quoting *Navellier v. Sletten* (2002) 29 Cal.4th 82, 95, fn. 11.)"

While Barker's burden may not be "high," he must demonstrate that his claim is legally sufficient. (*Navellier, supra,* 29 Cal.4th at p. 93.) And he must show that it is supported by a sufficient prima facie showing, one made with "competent and admissible evidence." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236; see *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497.)

Barker's demonstration does not measure up.

**Barker Has Failed to Demonstrate a Likelihood of Prevailing on the Merits**

Civil Code section 44 provides that defamation can be of two types, libel or slander. Libel is defined in Civil Code section 45, slander in section 46.

Civil Code section 45 provides: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

Civil Code section 46 provides: "Slander is a false and unprivileged publication, orally uttered . . . which:

"1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;

"2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;

"3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;

"4. Imputes to him impotence or a want of chastity; or

"5. Which, by natural consequence, causes actual damage."

15

As indicated above, Barker's complaint does not allege the actual words in the claimed defamatory utterances, only that they were in "e-mails" and in one oral comment. Barker's opposition to the motion revealed that the claimed defamatory statements were in the two e-mails quoted above, the first from Fox to Wagner, the second from Wagner to Barker's mother Nancy. More specifically, the claimed defamatory statements were a few sentences in those e-mails, which sentences were bold-faced in the e-mails submitted in Barker's opposition. Those bold-faced sentences were the following:

In Fox's e-mail to Wagner: "**As I understand, there was a list of items discussed with Alex prior to Carly's orientation. The expectation was that Alex would orient Carly to the fullest degree possible and address each of the items on the list. However, none of the items were addressed. Therefore for reasons not yet clear to me, Carly was placed in a situation ill prepared to fully understand and have knowledge to addressing Allison's needs**."

In Wagner's e-mail to Nancy: "**Alex was not cc'd , as he is not going to be a caregiver of choice at this time to interact with the training. Not because we don't like him; because you and Patty have the most experience to provide to Carly. He did not follow-thru with the instructions given him by Cindra and this causes us to take pause.**"

As to the claimed slander, this is how it is described in the declaration of Allison's daughter Olsen: "There is monitoring equipment at my mother's house that should have video-taped the incident between my mother and Carly. I wanted to see the video so I could better understand what happened. I was told that the video footage had gone missing. I had a face to face meeting with Deborah Wagner and I asked her about the missing video footage. Deborah replied, 'Yes, I want to talk to Alex about that.' " As to this statement, Olsen's declaration added: "implying that Alex had improperly tampered with the video footage."

So that is it, the basis of Barker's claim: the few sentences in the e-mails and Wagner's one sentence telling Olsen she wanted "to talk to [Barker] about that."

16

As noted, among defendants' arguments is that Barker failed to meet step two in the anti-SLAPP analysis because he did not demonstrate all the required elements of his defamation cause of action.

Barker's complete response to this is as follows:

"The Complaint Alleges That The Communications are Defamatory *per se*; Proof of Damages is not Required. [¶] . . .

"Appellants also argue that Barker's cause of action for defamation cannot stand because he has not alleged damages. [Citation.] Appellants are wrong. Where the statements are defamatory on their face, such as here, damages are presumed and a plaintiff is not required to plead or prove actual damages. Civil Code [section] 45(a); *Gautier v. General Tel. Co.* (1965) 234 Cal.App.2d 302.

"Section 45(a) defines 'libel on its face' as that 'which is defamatory of the plaintiff without the necessity of explanatory matter.' The Complaint alleges that Appellants published e-mails that falsely claimed that plaintiff was responsible for physical and mental injuries to an elderly woman who suffers from dementia; [citation] and then orally defamed plaintiff by claiming that he tampered with the video footage that should have captured the incident where she was injured . . . .

"The Complaint also alleges that the statements are also slanderous per se in violation [of] Civil Code Sections 46(3) and (5). [Citation.] Appellants accused Barker of being a poor performer, stated that he deserved disciplinary action, that he was incompetent and that was he responsible for the serious injuries caused to Allison McBride, an elderly woman under his care. [Citation.] All of these statements 'directly injure him in respect to his . . . profession, trade or business.' Civil Code Section 46(3). Where communications are slanderous per se, actual damages are presumed. *Moranville v. [Aletto]* (1957) 153 Cal.App.2d 667; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 107."

Passing over the fact that Barker's argument overstates what he in fact alleged, Barker is wrong procedurally, as he cannot rely on what his complaint alleges, as we have expressly confirmed. (*Hecimovich v. Encinal School Parent Teacher Organization*

17

(2012) 203 Cal.App.4th 450, 474, citing *Pavia v. Nichols* (2008) 168 Cal.App.4th 1007, 1017; *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 613–614.)[7]

Barker is also wrong legally, as his claim of defamation does require him to show special damages, as neither of the claimed defamatory statements in the e-mails is defamatory on its face. As Witkin describes it:

"**(cc) [¶ 541] California Doctrine of Libel Per Se.**

"A special meaning has been given to the term 'libel per se' in California and some other states. Where the statement is defamatory *on its face*, it is said to be libelous per se, and actionable without proof of special damage. But if it is defamation *per quod*, i.e., if the defamatory character is not apparent on its face and requires an explanation of the surrounding circumstances (the 'innuendo') to make its meaning clear, it is not libelous per se, and is not actionable without pleading and proof of special damages. [Numerous cases and authorities omitted.]

"The doctrine has been codified. 'A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof.' ([Civ. Code, §] 45a.) [Citation.]

"In *Barnes-Hind v. Superior Court* (1986) 181 [Cal.App.]3d 377, 381 . . ., the court said: 'If no reasonable reader would perceive in a false and unprivileged publication a meaning which tended to injure the subject's reputation in any of the

---

[7] As we also observed in *Hecimovich, supra,* 203 Cal.App.4th at p. 474, fn. 8: "*Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1289–1290, does state to the contrary. We note that *Salma* has not been followed by any other published decision, and that every other case holds to the contrary. We disagree with *Salma*, as apparently does the leading practical treatise: 'Comment: The anti-SLAPP statute should be interpreted to allow the court to consider the "pleadings" in determining the nature of the "cause of action"—i.e., whether the anti-SLAPP statute applies. But affidavits stating evidentiary facts should be required to oppose the motion (because pleadings are supposed to allege ultimate facts, not evidentiary facts).' (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2011) ¶ 7.1021.1, p. 7(II)-48 (rev. # 1, 2011), boldface omitted.)"

18

enumerated respects, then there is no libel at all. If such a reader would perceive a defamatory meaning without extrinsic aid beyond his or her own intelligence and common sense, then . . . there is a libel per se. But if the reader would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then . . . the libel cannot be libel per se but will be libel *per quod*,' requiring pleading and proof of special damages." (5 Witkin, Summary Cal. Law (10th ed. 2005) Torts, § 541, pp. 794–795.) That is the setting here.

Fox's e-mail discusses her understanding about what occurred relative to the incident with Allison. Fox never blamed Barker for injuring Allison. To the contrary, Fox did not know why she sustained injuries and did not know why Carly was ill-prepared to care for her. Based upon a discussion with a Fox & Associates nurse, Fox believed Barker was supposed to address certain items with Carly. Fox did not know why these items were not discussed. Most significantly, Fox's e-mail does not suggest a lack of honesty, incompetence, or any reprehensible trait on Barker's part. Wagner's e-mail to Nancy is similar, indicating only that Barker did not follow through with instructions he had been given.

*Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958 is persuasive. The issue there was whether a poor performance evaluation by an employer supported a claim for defamation. The trial court granted a nonsuit, and the Court of Appeal affirmed, holding that "unless an employer's performance evaluation falsely accuses an employee of criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior [citation], it cannot support a cause of action for libel. This is true even when the employer's perceptions about an employee's efforts, attitude, performance, potential or worth to the enterprise are objectively wrong and cannot be supported by reference to concrete, provable facts." (*Id*. at p. 965.) The court explained that a performance evaluation denotes opinion rather than fact, and went on to explain that the evaluation did not suggest the employee lacked "honesty, integrity or the inherent

competence, qualification, capability or fitness to do his job. . . ." (*Id.* at pp. 970–971; see also *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1153–1154 [supervisor accusing employee of " 'poor performance' " in his job assignment was a statement of opinion and not actionable defamation]; *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1554.)

Turning briefly to the alleged slander, it is in the one sentence by Wagner telling Olsen that she " 'want[s] to talk to [Barker] about that.' " That statement is not defamatory on its face, perhaps best shown by Olsen's editorial that it "impl[ied] that [Barker] had improperly tampered with the video footage." To be defamatory per se, the slander must be apparent "without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." (Civ. Code, § 45a.) Wagner's statement does not accuse Barker of anything. It is simply her stated intention to continue her own investigation of the incident.

In sum, Barker's defamation claim fails because he has failed to demonstrate all requisite elements of it. Likewise for an additional reason—the "common interest" privilege.

As indicated, the two e-mails about which Barker complains were sent to Allison's two daughters, Wagner's attorney, two employees of Fox & Associates, and two of Allison's Angels. So, defendants contended, any publication was protected by the common interest privilege in Civil Code section 47, subdivision (c), which extends a privilege to statements made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." The privilege is recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest. (*Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1118.)

Barker's opposition below on this point was slightly over one page, and essentially argued the claimed falsity of the statements. So, his argument ended, "[D]efendants had

20

no reasonable basis to believe the truth of their statements creates an inference of malice. *Snively* [*v. Record Publishing Co.*] (1921) 185 Cal. 565. Consequently, Defendants['] defamatory statements are not privileged under Civil Code § 47(c)."

Barker's position here is similar, in a two and a half page argument entitled, "The Trial Court Correctly Found That The Evidence Supports A Finding that the Communications Were Made With Malice, Thus The Common Interest Privilege Does Not Apply." The argument begins with citation to the Civil Code sections, proceeds to two paragraphs contending that "the cases cited by [defendants] are easily distinguishable, and ends with these three paragraphs:

"This is not a case of mere reasonable grounds to believe the information to be true. Rather, Barker argued that Appellants knew that the statements were false and made them to shift the blame off of them.

"Fox and Wagner's e-mails claim that Cindra White, a Fox & Associate employee, gave Barker a list of instructions to go over with Ms. Newell and that his failure to address the items with Ms. Newell placed Ms. Newell in a position where she was unprepared to care for Allison, resulting in injuries to Allison. [Citation.] Barker's Opposition to Appellants['] Motion to Strike offered evidence that this is false. Barker was given no instruction and came up with his own list of items to address with Ms. Newell in an attempt to orient her within the short time he was given. [Citation.] Barker also offered evidence that appellants were responsible for the injuries suffered by Allison. He showed that appellants were repeatedly warned that Allison became combative with strangers and were advised to introduce new caretakers gradually. In short, Barker presented evidence that it was Wagner's insistence to use the nursing services of her friend's company coupled with Wagner and Fox's refusal to heed warnings by those who knew Allison which placed Ms. Newell in a situation where she was ill prepared to care for Allison which resulted in injuries to Allison. [Citations.]

"The Trial Court found that the evidence presented by Barker supported his allegations that when Appellants accused Barker of being responsible for Allison's injuries, they not only knew the accusation to be false, but they were motivated to make

21

the false statements 'to cover up their own errors' and that 'Defendants' statements and conduct were therefore malicious.' [Citation.] The Trial Court's finding is correct and should be affirmed." Barker's assertion is unsupported. So, too, is the trial court's "finding" of malice.

To begin with, malice may not be inferred from the mere fact of the communication. (*Terry v. Davis* (2005) 131 Cal.App.4th 1534, 1558.) No, as our colleagues in Division Five recently confirmed, " '[M]alice,' within the meaning of Civil Code section 47, subdivision (c), is ' " 'established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights . . . .' " ' " (*Hui v. Sturbaum*, *supra*, 222 Cal.App.4th at p. 1121; see *Noel v. River Hills Wilsons* (2003) 113 Cal.App.4th 1363, 1371 [mere negligence, in the sense of oversight or unintentional error, is not enough to constitute malice].)

Here, there is simply no evidence that personal hatred or ill-will toward Barker motivated Fox or Wagner, or that Fox lacked grounds to believe her statement about the incident involving Carly was true based on the evidence then available to her. Barker's conjecture and supposition to the contrary is not sufficient to sustain his burden under step two of the anti-SLAPP process, as expressly held in *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 931: " 'It is not sufficient to show that the statements . . . were inaccurate, or even unreasonable. Only willful falsity or recklessness will suffice. "It is only when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a willful disregard for or avoidance of accuracy, that malice is shown." ' (Also see *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538–1540 [summary judgment].) There is no such evidence here.

In sum, to defeat a SLAPP motion, Barker had to overcome substantive defenses. (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 447–448.) He did not, and his claim would fail for his inability to show malice, as have the claims of many other plaintiffs who lost anti-SLAPP motions because of such inability. (See

22

*Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 275; *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1162; *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 689–690; *Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 226–227.)

Barker's two emotional distress claims also fail.

We recently discussed the tort of intentional infliction of emotional distress, in *Bock v. Hansen* (2014) 225 Cal.App.4th 215, 232–233, as follows:

"The law was confirmed in *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051 . . . where, affirming a summary judgment for defendants, the Supreme Court observed as follows:

" 'A cause of action for intentional infliction of emotional distress exists when there is " ' " " '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' " ' " [Citations.] A defendant's conduct is "outrageous" when it is so " ' "extreme as to exceed all bounds of that usually tolerated in a civilized community." ' " [Citation.] And the defendant's conduct must be " ' "intended to inflict injury or engaged in with the realization that injury will result. " ' " [Citation.]

" 'Liability for intentional infliction of emotional distress " 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' [Citation.]" [Citations.] . . . .

" 'With respect to the requirement that a plaintiff show severe emotional distress, this court has set a high bar. "Severe emotional distress means ' "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." ' " ' (To the same effect, see *Schlauch v. Hartford Accident & Indemnity Co.* (1983) 146 Cal.App.3d 926, 936 [conduct must be ' " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community' " ']; and CACI No. 1602 [conduct must go beyond mere insults, indignities, threats, hurt feelings or bad manners that a reasonable person is expected to endure].)"

23

There is no such conduct here.

Barker asserts that "[w]hether that conduct is in fact outrageous is a 'question of fact' to be determined by the jury," citing *So v. Shin* (2013) 212 Cal.App.4th 652 and *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004. While those cases say that it is "usually" a question of fact, many cases have dismissed intentional infliction of emotional distress cases on demurrer, concluding that the facts alleged do not amount to outrageous conduct as a matter of law. (See, e.g., *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1608–1609; *Coleman v. Republic Indemnity Ins. Co.* (2005) 132 Cal.App.4th 403, 416–417; *Ricard v. Pacific Indemnity* (1982) 132 Cal.App.3d 886, 895.)

Barker's claim requires several things missing here. First, the complained-of conduct must be outrageous, that is, beyond all bound of reasonable decency. (*Cervantez v. J.C. Penny Co.* (1979) 24 Cal.3d 579, 593; Rest.2d Torts, § 46, com. d, pp. 72–73 ["no occasion for the law to intervene in every case where some one's feelings are hurt"].)

Second, the conduct must be "intended to inflict injury or engaged in with the realization that injury will result." (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 210.)

Third, Barker must demonstrate that he suffered severe emotional distress. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946.)

As to Barker's third cause of action, for negligent infliction of emotional distress, as *Hecimovich* also confirmed, such tort "does not even exist. 'The negligent causing of emotional distress is not an independent tort but the tort of negligence, involving the usual duty and causation issues. Recovery is generally allowed where there is physical impact. (See e.g., *Di Mare v. Cresci* (1962) 58 [Cal.2d] 292, 297, 300 . . . *Lawson v. Management Activities* (1999) 69 [Cal.App.4th] 652, 656 [policy of designating tort as negligent infliction of emotional distress often incorrectly results in its being treated as independent tort].)' (6 Witkin, *supra*, Summary of Cal. Law, Torts, § 1004, p. 270, citation omitted.)" (*Hecimovich v. Encinal School Parent Teacher Organization, supra,* 203 Cal.App.4th at p. 477.)

24

## DISPOSITION

The order denying the anti-SLAPP motion is reversed, and the matter remanded with instructions to (1) enter an order granting the motion and (2) hold a hearing, following further briefing, to award defendants the attorney fees to which they are entitled under section 425.16.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Miller, J.

Counsel for Defendants and Appellants: LEWIS BRISBOIS BISGAARD & SMITH, Reuben B. Jacobson, Jeffry A. Miller, and Brittany H. Bartold

BEYERS COSTIN SIMON, Bob Haroche and Suzanne K. Babb for Defendant and Appellant Deborah Wagner

Counsel for Plaintiff and Respondent: LAW OFFICES OF FREEMAN & FREEMAN, Rebecca J. Freeman, Matthew C. Freeman, and Molly A. Gilardi

Trial Court: Sonoma County Superior Court

Trial Judge: Honorable Gary Nadler