Filed 3/30/23  Young v. Schultz CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JACALYN A. YOUNG et al.,<br>    Plaintiffs and Appellants,<br>v.<br>RONALD J. SCHULTZ,<br>    Defendant and Respondent. | A165581<br><br>(Sonoma County<br>Super. Ct. No. SCV-269601) |

Jacalyn Young joined the board of her homeowner's association and became its president during a tumultuous time. Several association members — including Ronald Schultz — questioned whether Young was qualified to lead the association through the crisis, and they sought more information about her and the board's oversight of association finances. Frustrated by Young's failure to promptly address these concerns, Schultz performed a public records search; he learned that Young and two friends — Diane Lynn and Mary Anne Burwell — (collectively, plaintiffs) appeared to be running several "internet churches" without parishioners out of Young's home. He suspected plaintiffs were engaged in "possible fraud and/or money laundering" and that under the circumstances, it was "risky and foolish" to allow Young to manage the association's finances. He wrote plaintiffs, threatening to release information about their affiliation with the religious

organizations unless Young resigned from the board, and he intimated governmental authorities would "want to talk" with plaintiffs "once the word is out."

Young did not resign. Instead, plaintiffs filed a lawsuit against Schultz for extortion and other claims. The trial court granted Schultz's special motion to strike (Code Civ. Proc., § 425.16; undesignated statutory references are to this code). First, the court concluded plaintiffs' claims arose out of protected activity and Schultz's conduct did not come within the narrow statutory exception for conduct that is illegal as a matter of law. Second, it determined plaintiffs failed to establish a probability of prevailing on their claims. We affirm.

## BACKGROUND

Young is the president of The Temple of Life, Inc. (church), a self-described "human charitable foundation" to which she has donated over $1.4 million. Lynn is the church's chief financial officer; until her death, Burwell was its secretary.[1] The church and two other charitable organizations — The Temple of Metaphysical Science and the Temple of Freedom — are registered for service of process at Young's residence in the Woodlands, a residential community in Santa Rosa comprised of 27 townhomes. Young and Lynn live near each other in the Woodlands, and they are members of the Woodlands

---

[1] Burwell died during the pendency of this appeal. We grant Young's March 13, 2023 motion to substitute as Burwell's successor in interest. (§ 377.31; *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1152–1153.) We do not describe or consider evidence excluded by the trial court, including the majority of plaintiffs' declarations filed in opposition to the special motion to strike. Plaintiffs have not challenged the court's evidentiary rulings, which " 'effectively gutted [their] arguments of any evidentiary support.' " (*Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1196.) We omit references to other litigation arising out of this incident.

Owners Association (HOA). Schultz and his wife live in the Woodlands; they too are HOA members.

In March 2021, the HOA was in disarray. The president of its board of directors unexpectedly resigned shortly after the board hired a new property manager to manage HOA finances. Then Young joined the board; two weeks later, she became its president. On April 12 — the first day of her presidency — the board fired the property manager. The board started to manage HOA finances itself, and it decided homeowners would begin using a web-based service (the company) to pay monthly dues. The board notified homeowners of these developments; it assured them HOA funds were "safe" despite acknowledging the board did not know how much HOA money was in the former property manager's possession.

In mid-April 2021, Schultz sent two emails to the board requesting information about the company and suggesting the HOA was negligent for failing to provide homeowners with the company's terms of service. Around that same time, Schultz's wife emailed the board a list of questions about the HOA's accounting procedures — such as who paid the bills and generated monthly financial reports — and noted that as a former board treasurer, she was "very concerned" about these issues. The next day, Schultz's wife sent another email to the board criticizing Young's failure to respond to her questions. Eventually, Young promised to answer the questions at an upcoming board meeting.

On the evening of April 19, 2021, Schultz emailed Young. He accused the board of failing to understand internet security principles and neglecting to implement internal accounting controls. Schultz also demanded information on Young's background and her qualifications to serve as board president. He asked, "Since you are going to have virtually total control of an

unsecured accounting system that contains tens of thousands of dollars and generat[es] over $13,000 each month, are you willing to allow a criminal background check?  [¶]  During the past thirty-odd years, this association has gone through many property managers and each transition has always been seamless, without anxiety.  [¶]  I'm sorry you have decided to take us down a different path."

Two days later — on April 21, 2021 — Schultz emailed a letter to Young.  The email's subject line was "For the Good of All, I Urge You Resign From the Board."  The letter stated:

"As President for the churches 'The Temple of Life', 'The Temple of Metaphysical Science', and 'Temple of Freedom', I am writing this letter to you [to] urge you to resign as a board member of The Woodlands Association by 5:00 PM April 22, 2021.  [¶]  From my experience as CEO of Netfilter Technologies (1998-2002), a software company specializing in Internet security, the three churches you and Diane Lynn . . . presently run out of The Woodlands, generating tax-free income without any parishioners except yourselves is an obvious 'red flag' for possible fraud and/or money laundering.  Clearly, having you as a Woodlands Board member having direct access to tens of thousands of dollars in our bank account and the $13,000 monthly dues is both risky and foolish.  [¶]  To save my fellow homeowners the embarrassment of having to confront their lack of common sense of choosing you as their President, I'm giving you the opportunity to leave the board 'for personal reasons.'  If you resign (via email to the board with a cc to me) prior to 5:00 PM tomorrow, I and my trusted cohorts are willing to hold this information confidential."

The letter continued: "If you do not resign prior to 5PM, the information will be released to the full membership.  While I have no proof

4

that your church activities are illegal, I get the strangest feeling (once the word is out) the IRS and the State of California Department of Corporations will want to talk to you and Ms. Lynn. [¶] Frankly, this is also a fun New York Times story: Two elderly ladies, running multiple churches out of a condominium complex that has generated tax-free profit under everyone's radar for twenty years. [¶] In any case, it's your call." The email attached a three-page document — labeled "RAW DATA " — containing information Schultz had gathered and stating Young and Lynn were operating churches out of their homes that "appear to generate substantial tax-free income from unknown sources with no parishioners."

That same day, Schultz hand-delivered similar letters — also accompanied by "RAW DATA" — to Lynn and Burwell "in the hopes" they would urge Young to resign from the board. In his letter to Lynn, Schultz stated he was "sorry" about her sister's "passing . . . she appeared to be a fine person."

The next day, Young emailed the HOA. In her email — which attached the letters — she complained Schultz wanted her to resign so "he can undermine the new-found openness and cooperation between the homeowners and the board . . . . He appears . . . frustrated and angry that I will not violate the Davis-Stirling law and answer questions outside of a board meeting." She suggested Schultz was "getting close to blackmail," and she urged homeowners to read "his ultimatum" and decide for themselves. Young stated she did "not care who is on the board, as long as the conditions improve here at the Woodlands." She also described her professional background, acknowledged serving as a board member for "a church foundation," and insisted she had "nothing to hide." She stated the activities of her "human charitable foundation" were "conducted with the

5

utmost of integrity and by government rules." Finally, she noted Schultz had promised not to expose her "human charitable work" if she resigned, but she questioned how one could expose "public information."

Two days later — and in response to questions from homeowners — Young sent another email to the HOA. She provided additional detail regarding her work history, clarified her involvement with the church, and noted the board had put "processes, procedures, and safeguards in place so that owners can be assured their money is safe, . . . and that all the outstanding Woodlands bills are paid." She noted the board had placed information on certain HOA expenditures on the company's website to provide "more transparency into the finances than by any other prior Board," and she promised to explain the safeguards at the next board meeting. She also asserted the company's website was secure. At a May 2021 meeting, the board described the property management transitions, provided an overview of HOA finances, and explained the company's security features.

This litigation followed. In October 2021, plaintiffs filed a complaint against Schultz alleging claims for libel, intentional infliction of emotional distress, "Menace (Extortion)," and conspiracy. The complaint acknowledged the HOA was in a state of turmoil when Young became president, and that Schultz wrote the letters after the board announced it would investigate "how the HOA found itself in such poor financial and structural condition." According to the complaint, Schultz wrote the letters "to threaten and coerce Young into immediately resigning" from the board, so that he "could presumably install himself or someone sympathetic to his views in the office." The complaint further alleged the letters falsely stated the church was a nonoperational front for Young "to steal and launder money" and that "Schultz twisted the facts of Young's involvement and status of her church, in

6

order to fabricate the false light that she is 'using three churches' to steal and launder money from 'three non-operational non-profit organizations.' "

As relevant here, the libel cause of action alleged the letters falsely accused plaintiffs of "committing the crimes of financial fraud and money laundering" and charged them with "improper and immoral conduct" and "dishonesty."[2] The letters — which were seen by all HOA members — caused plaintiffs to suffer "loss of . . . reputation, shame, mortification, and hurt feelings." The "Menace (Extortion)" claim alleged Schultz threatened to expose their "possible fraud and/or money laundering" to the HOA, governmental authorities, and the New York Times unless Young resigned from the board, and that Young disclosed the letters to "protect her integrity and reputation" as board president. The complaint further alleged the letters damaged Young and Lynn's character and caused unspecified "damage" to Burwell. Plaintiffs' intentional infliction of emotional distress cause of action alleged Schultz's threat to expose them was intentional, malicious, and calculated to cause emotional and physical harm. Finally, plaintiffs' conspiracy cause of action alleged Schultz conspired with his "cohorts . . . to prepare and send the letters of extortion." The complaint attached the correspondence from Schultz and his wife.

Schultz filed a special motion to strike. (§ 425.16.) He argued the letters concerned Young's fitness to serve as board president and to control HOA finances, and that issues pertaining to HOA governance come within section 425.16, subdivision (e)(4), which protects speech on an issue of public interest. He also insisted plaintiffs' claims arose from the letters, and that

---

[2] Young and Lynn alleged the letters addressed to them were libelous on their face. (See *Edward v. Ellis* (2021) 72 Cal.App.5th 780, 790 [describing libel per se].)

7

they could not establish a probability of prevailing. In supporting declarations, Schultz stated "a dispute arose among the HOA membership following Ms. Young's decision to terminate" the property manager and "self-manage all HOA finances." The HOA's financial welfare — and Young's qualifications to serve as board president and manage HOA finances — were of concern to him and other HOA members, but when he and other members asked her to address these concerns at HOA meetings, she refused.

Schultz wrote the letters because he felt he "had no other recourse to address [his] concerns and the concerns of other HOA members." He obtained the information about plaintiffs by conducting a public records search with assistance from municipal employees. He did not "seek any money, property, or anything else of value" from plaintiffs, and he had no desire to serve as board president — a "voluntary and unpaid position." Finally, Schultz noted an attorney for the HOA accused him of committing a "civil tort," and "[n]ot realizing [his] actions may possibly be illegal, [he] immediately erased all the 'RAW DATA' information" from his computer to ensure "no one could possibly have access to the material in the future." His wife and three other HOA members offered declarations describing their concerns upon learning Young — who was "virtually unknown" to them — would have control over large sums of HOA money. These neighbors had "accounting questions," and they encouraged Schulz and his wife to "find answers."

Over plaintiffs' opposition, the trial court granted the special motion to strike. First, it determined the letters were protected under section 425.16 because a homeowner's association fulfills "a quasi-governmental function for subsets of society," and the qualifications of association board members were thus a matter of public interest. The court also found the letters advanced

8

Schultz's "intent to have a public discussion of the alleged issues, and as such represented protected activity." Rejecting plaintiffs' argument to the contrary, the court determined Schultz's conduct did not fall within an exception to section 425.16 as the letters did "not constitute extortion as a matter of law." Extortion, the court explained, requires a defendant to seek consideration, and plaintiffs neither alleged anything of value nor "established that the HOA Presidency has value."

Second, the trial court concluded plaintiffs could not show a probability of prevailing on their claim for libel because the letters contained statements of opinion, and no probability of prevailing on their cause of action for intentional infliction of emotional distress because Schultz's threat to disclose "otherwise public information, while perhaps unscrupulous," did not shock the conscience. The court also found plaintiffs failed to show a probability of success on their civil extortion claim as they failed to allege — or offer evidence tending to show — Schultz requested or received "something of value as a result of his alleged threats." Finally, the court concluded plaintiffs' conspiracy cause of action had no possibility of success in the absence of a viable tort claim.

## DISCUSSION

Section 425.16 provides a procedure for weeding out meritless claims arising from protected speech activity. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384; *Flickinger v. Finwall* (2022) 85 Cal.App.5th 822, 831–832 (*Flickinger*).) Under the statute, the defendant has the burden to establish the challenged claim arises from protected activity. (*Flickinger*, at p. 832.) If the defendant makes this showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the merits. (*Ibid*.) We independently review the trial court's order on the special motion to strike, considering the

9

pleadings and admissible evidence submitted in support of — and in defense to — the claims. (*Flickinger*, at p. 831; *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

## I.

We begin by considering whether plaintiffs' claims arise from acts in furtherance of Schultz's right of petition or free speech under section 425.16, subdivision (e). As relevant here, an act in furtherance of a person's right of petition or free speech includes any conduct "in connection with a public issue or an issue of public interest." (*Id.*, subd. (e)(4).) The term "public interest" includes "not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479.) It is well settled a "homeowners association board is in effect 'a quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government.' " (*Id.* at p. 475.) Because a " 'homeowners association functions as a second municipal government' " (*id.* at p. 479), numerous courts have held disputes pertaining to association governance are matters of "public interest" within the meaning of section 425.16. (See, e.g., *Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 131–132 [collecting cases].)

When — as here — the matter is of interest only to a limited portion of the public, section 425.16, subdivision (e)(4) is satisfied if the protected activity occurs " 'in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance.' " (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1468;

*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 140 [context is relevant when evaluating whether speech is protected under subd. (e)(4)].) Here, Schultz suspected plaintiffs may have engaged in fraud or money laundering, and he questioned whether Young was fit to serve as board president. These concerns were of interest to the entire HOA membership, a definable portion of the public. (*Ruiz*, at p. 1468.) Indeed, several HOA members shared Schultz's apprehension about the wisdom of allowing Young to control large sums of HOA money while the HOA was in financial and structural disarray, and they urged Schultz to "find answers." Thus, when Schultz wrote the letters, there was an ongoing discussion regarding the manner in which the HOA would be governed. Moreover, the record demonstrates the letters furthered the discourse on this matter — in response to the letters, Young communicated with the HOA about her qualifications and outlined steps the board was taking to increase financial oversight. (*Ruiz*, at p. 1469; *FilmOn.com Inc.*, at p. 151; *Damon v. Ocean Hills Journalism Club*, *supra*, 85 Cal.App.4th at p. 479.)

As it is undisputed all of plaintiffs' causes of action arise out of the letters, we conclude the gravamen of their claims concern matters of "public interest" under section 425.16, subdivision (e)(4). (*Country Side Villas Homeowners Assn. v. Ivie* (2011) 193 Cal.App.4th 1110, 1117–1118; *Damon v. Ocean Hills Journalism Club*, *supra*, 85 Cal.App.4th at pp. 479–480.) In urging us to reach a contrary conclusion, plaintiffs briefly assert there was no public debate or dispute. We find this argument unpersuasive for the reasons discussed above and for the additional reason that it relies on evidence excluded by the trial court. (*Villanueva v. City of Colton*, *supra*, 160 Cal.App.4th at pp. 1195–1196.) Nor are we persuaded by plaintiffs' reliance on *Donovan v. Dan Murphy Foundation* (2012) 204 Cal.App.4th

11

1500.  There, the board of a charitable foundation removed a member who raised concerns about the foundation's financial oversight and governance. (*Id.* at pp. 1502–1503.)  *Donovan* held the vote to remove the board member did not come within section 425.16, subdivision (e)(4) because defendants "presented no evidence of widespread public interest in the financial oversight or governance" of the foundation.  (*Donovan*, at pp. 1508–1509.) The removal of the board member was, *Donovan* explained, akin to a private disagreement between an employer and its employee.  (*Id.* at p. 1509.) *Donovan* is distinguishable.  Here, the HOA is a quasi-governmental entity, not a private foundation, and Schultz offered evidence demonstrating the letters raised issues of interest to the HOA.

Plaintiffs also contend their complaint does not arise out of protected activity because Schultz engaged in extortion, which is not constitutionally protected.  (See *Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005 (*Geragos*); *Flatley v. Mauro* (2006) 39 Cal.4th 299, 328 (*Flatley*).)  True, section 425.16 does not protect speech or petitioning activity that is " 'illegal as a matter of law' " — including criminal extortion.  (*Flickinger*, *supra*, 85 Cal.App.5th at p. 832.)  But this exception — known as the *Flatley* exception — applies only in narrow circumstances when either the evidence conclusively establishes, or the defendant concedes, illegality as a matter of law.  (*Flickinger*, at p. 832.)  "The mere fact the plaintiff alleges the defendant engaged in unlawful conduct does not cause the conduct to lose its protection" under the statute.  (*San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 82.)  Instead, the plaintiff must conclusively prove illegality (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 385); if there is any factual dispute regarding " 'the legitimacy of the defendant's conduct, it cannot be resolved within the first step' " of a special

motion to strike.  (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 424 (*Vasquez*).)

Penal Code section 518 prohibits extortion, defined as obtaining property or other consideration — anything of value — from another person with that person's consent by wrongful use of force or fear.  (See *Geragos*, *supra*, 88 Cal.App.5th at p. 1022; CALCRIM No. 1830 [listing elements].)  As relevant here, wrongful use of fear includes threatening to accuse a person "of a crime," or threatening to expose, or to impute to the person, a "disgrace, or crime."  (Pen. Code, § 519, subds. (2), (3).)  Penal Code section 523 — which prohibits extortion by threatening letter — provides that a "person who, with intent to extort property or other consideration from another, sends or delivers to any person any letter or other writing . . . expressing or implying . . . any threat" specified in Penal Code section 519 may be punished in the same manner as if such money or property were actually obtained by means of the threat.  (Pen. Code § 523, subd. (a); see *Geragos*, at p. 1022.)  Penal Code section 524 criminalizes attempted extortion.  (*People v. Sales* (2004) 116 Cal.App.4th 741, 748–749.)

Extortion often involves a threat to perform an act specified in Penal Code section 519 " 'coupled with a demand for money.' "  (*Flatley*, *supra*, 39 Cal.4th at p. 326.)  *Flatley* is the seminal case.  There, attorney Mauro sent a renowned entertainer a demand letter claiming the entertainer had raped his client; in subsequent telephone calls with the entertainer's attorneys, Mauro threatened to sue the entertainer, to report him to federal and local authorities, and to destroy his career unless the entertainer paid seven figures to settle the alleged rape claims.  (*Id.* at pp. 305, 307–311.)  Thereafter, the entertainer sued Mauro for civil extortion and other claims;

13

Mauro filed a special motion to strike, insisting the letter was a prelitigation settlement offer protected by section 425.16. (*Flatley*, at p. 305.)

In upholding the denial of the special motion to strike, the California Supreme Court concluded the letter and phone calls "constituted criminal extortion as a matter of law." (*Flatley*, *supra*, 39 Cal.4th at pp. 305, 333.) As the *Flatley* court explained, the uncontroverted evidence demonstrated Mauro's threats to publicly accuse the entertainer of rape, and to report and publicly accuse him of violating the law — unless the entertainer paid at least $1 million to Mauro's client, a percentage of which would go to Mauro — constituted extortion in contravention of Penal Code sections 518, 519, and 523. (*Flatley*, at pp. 329–332.) *Flatley* emphasized its conclusion was "based on the specific and extreme circumstances of this case" and cautioned its opinion "should not be read to imply that rude, aggressive, or even belligerent prelitigation negotiations . . . that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing, necessarily constitute extortion." (*Id.* at p. 332, fn. 16.)

Applying *Flatley*, courts have held letters threatening to report a party to governmental authorities, to accuse a party of a crime, or to expose the party to public disgrace constitute extortion as a matter of law "when the threat is linked to a monetary demand." (*Falcon Brands, Inc. v. Mousavi & Lee, LLP* (2022) 74 Cal.App.5th 506, 520; *Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405, 1420, fn. 12, 1421–1423 [e-mail threatened to expose former employee to federal authorities unless employee settled former employer's defamation claims]; *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799, 806 [threatening to report plaintiff to law enforcement agencies and disclose alleged wrongdoing to plaintiff's customers if he did not pay damages exceeding $75,000].)

With this framework in mind, we turn to the circumstances of this case. We assume for the sake of argument that Schultz's threat to release information about plaintiffs' association with the churches — together with intimating the disclosure would garner interest from governmental authorities and a prominent newspaper — constituted a threat to accuse plaintiffs of a crime or to expose or connect them to a disgrace or crime. But unlike *Flatley* and its progeny, Schultz's threat was not coupled with a demand for money. Thus, to establish the first prong of the *Flatley* exception, plaintiffs had the burden to offer uncontroverted evidence conclusively showing Schultz intended to use fear to obtain property or other consideration — something of value — from plaintiffs. (See Pen. Code, §§ 518, subd. (b); 523, subd. (a); CALCRIM No. 1831 [listing elements of extortion by threatening letter].)

Plaintiffs do not contend Young's right to continued board service constitutes "property" for purposes of extortion. (See *Galeotti v. International Union of Operating Engineers Local No. 3* (2020) 48 Cal.App.5th 850, 859, 862 [broadly defining property to include intangible benefits and prerogatives capable of possession or disposition, among them the right to continued employment].) Issues do not have a life of their own — if they are not raised, they are forfeited — and we express no opinion on this question. (*Estate of Jones* (2022) 82 Cal.App.5th 948, 955 & fn. 1.) Instead, plaintiffs assert the board presidency is consideration — a "thing of value" — under Penal Code section 518. The statute does not define "value." At plaintiffs' urging, we look to the dictionary definition. Merriam-Webster's dictionary defines "value" as "the monetary worth of something," or "relative worth, utility, or importance." (Merriam-Webster Dict. Online (2023) <https://www.merriam-webster.com/dictionary/value> [as of Mar. 30, 2023].) The parties have not

15

cited — and our research has not disclosed — California authority holding volunteer service on a nonprofit board has value for purposes of extortion.[3] In any event, we need not decide this issue because, even if we accept the theoretical premise that Young's board presidency *could* qualify as consideration within the meaning of Penal Code section 518, plaintiffs have not satisfied their burden to offer *uncontroverted and conclusive evidence* the presidency has value.

For example, there's no evidence that the board presidency has "monetary worth." (Merriam-Webster Dict. Online, *supra*, <https://www.merriam-webster.com/dictionary/value> [as of Mar. 30, 2023].) Nor is there any conclusive evidence on the presidency's "relative worth, utility, or importance" — e.g., evidence enumerating the president's powers or describing the presidency's utility. (*Ibid*.) Likewise, there are no declarations explicitly attesting to the presidency's importance to HOA members or opining it has intrinsic value. To the extent there are inferences of value to be drawn from unspecified circumstantial evidence in the record, those inferences do not prove illegality as a matter of law. (*Vasquez, supra*, 1 Cal.5th at p. 424.)

On the other hand, Schultz testified he did not "seek any money, property, or anything else of value" from plaintiffs, and he stated did not

---

[3] Plaintiffs rely on federal court cases interpreting the phrase "thing of value" in 18 United States Code section 876, subdivision (d) — which prohibits mailing threatening communications — to include "intangible objectives" (*United States v. Scott* (9th Cir. 1989) 884 F.2d 1163, 1166) such as the right to testify in a criminal case. (*United States v. Nilsen* (11th Cir. 1992) 967 F.2d 539, 542–543.) We are not bound by these interpretations of federal law; moreover, these cases do not assist plaintiffs because, as we discuss below, there is no uncontested and conclusive evidence anyone derived an intangible objective or benefit from Young's board presidency.

16

want to serve as board president — a "voluntary and unpaid position." He also offered evidence that Young "did not care who [was] on the board." On this record, plaintiffs have not satisfied their burden to *conclusively* establish Schultz committed extortion as a matter of law by intending to use fear to obtain something of value from them. (*Geragos, supra*, 88 Cal.App.5th at p. 1025 [competing declarations created disputed factual issue]; *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 967 [factual dispute precluded application of *Flatley* exception].) This simply is not "one of those rare cases in which there is uncontroverted and uncontested evidence" establishing extortion "as a matter of law." (*Cross v. Cooper, supra*, 197 Cal.App.4th at p. 386.)

Plaintiffs also contend the *Flatley* exception applies because Schultz conceded his conduct was illegal. We disagree. In his special motion to strike, Schultz disputed the extortion allegations, and he denied seeking anything of value from plaintiffs. (*Vasquez, supra*, 1 Cal.5th at p. 424.) Ignoring this evidence, plaintiffs insist Schultz conceded the illegality of his conduct when he acknowledged having "no proof" their church-related activities were "illegal." This comment is not a concession because a claim for extortion does not "turn on whether the conduct threatened to be exposed is true." (*People v. Umana* (2006) 138 Cal.App.4th 625, 638; *Mendoza v. Hamzeh, supra*, 215 Cal.App.4th at p. 805.) Plaintiffs also rely on Schultz's admission that his act of delivering the letters "may possibly be illegal." But Schultz made this remark in response to an accusation that he had committed a tort; considered in context, his qualified language describing the accusation is not a concession his conduct was illegal.

In sum, we conclude plaintiffs' complaint arises out of protected petitioning activity and plaintiffs have not established Schultz's acts are

17

illegal as a matter of law. "This state of the case forecloses a resolution at the first step of the [special motion to strike] inquiry." (*Vasquez, supra,* 1 Cal.5th at p. 424.)

## II.

We turn to the second step of the special motion to strike analysis — whether plaintiffs have demonstrated a probability of prevailing on their claims. Here, our task is to determine whether plaintiffs have stated legally sufficient claims and made a prima facie factual showing sufficient to sustain judgment in their favor. (*Monster Energy Co. v. Schechter, supra,* 7 Cal.5th at p. 788.) To satisfy this burden, plaintiffs must offer "competent admissible evidence." (*Id.* at pp. 788, 795 ["properly submitted admissible evidence should be considered"].) We accept as true plaintiffs' evidence, and we evaluate Schultz's evidence only to determine if it defeats plaintiffs' claims as a matter of law. (*Id.* at p. 795.) Although we resolve "conflicts and inferences in the record" in plaintiffs' favor, we do not consider "speculative inferences not supported by the evidence proffered." (*Ibid.,* citing *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 949.)

The trial court determined plaintiffs could not show a probability of prevailing on any of their causes of action. It first concluded plaintiffs failed to show a probability of success on their claim for libel because Schultz's statement that their church-related behavior raised an "obvious 'red flag' for possible fraud and/or money laundering" was a statement of opinion. Libel requires the publication of an "unprivileged written communication about the plaintiff that is false, defamatory, and has a natural tendency to injure." (*Edward v. Ellis, supra,* 72 Cal.App.5th at p. 790.) " 'A statement is not defamatory unless it can reasonably be viewed as declaring or implying

18

a provably false factual assertion.' [Citations.] Whether a statement declares or implies a provably false assertion of fact is generally a question of law to be decided by a court." (*Bishop v. The Bishop's School* (2022) 86 Cal.App.5th 893, 909–910 (*Bishop*).) In making this determination, courts consider the totality of the circumstances, "looking first to the language of the statement and whether it was understood in a defamatory sense, and then considering the context in which the statement was made," and " 'whether the reasonable or "average" reader would so interpret the material.' " (*Edward*, at pp. 790–791.)

In a passing reference, plaintiffs fault the trial court for improperly weighing the evidence, and they characterize Schultz's comment as an "affirmative accusation" rather than an opinion. Plaintiffs, however, do not identify the evidence they claim was erroneously weighed, and they do not conduct the nuanced analysis required to evaluate whether the court erred in concluding the letters contained statements of opinion. (*Melaleuca v. Clark* (1998) 66 Cal.App.4th 1344, 1354 [distinction between fact and opinion " 'is frequently a difficult one' "].) Moreover, plaintiffs do not describe the difference between libel per se and traditional libel (see *Bartholomew v. YouTube, LLC* (2017) 17 Cal.App.5th 1217, 1226–1228) or meaningfully engage with any of the elements of a libel cause of action — for example, they do not point to evidence in the record that Schultz's statement was false (*Bishop, supra*, 86 Cal.App.5th at p. 911) and they do not explain how Schultz's act of writing each individual plaintiff constitutes "publication" in this context (see *Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645).

It is a fundamental rule of appellate procedure that the appellant is required to convince us — by developing an argument and supporting it with analysis and record citations — "that the trial court committed reversible

19

error." (*Bishop*, *supra*, 86 Cal.App.5th at p. 910; *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) Plaintiffs have not done that here, and by failing to do so, they have forfeited their challenge to the court's ruling with respect to their libel cause of action. (*Bishop*, at p. 910.) We are not obligated to make or develop arguments for the parties; we disregard conclusory arguments unsupported by pertinent legal authority or cogent analysis. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

The trial court next concluded plaintiffs failed to show a probability of prevailing on their intentional infliction of intentional distress claim because Schultz's conduct did not shock the conscience. We agree. As relevant here, a claim for intentional infliction of emotional distress requires proof of extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050.) "Conduct is considered outrageous when it is 'so extreme as to exceed all bounds of that usually tolerated in a civilized community.' " (*Belen v. Ryan Seacrest Productions, LLC* (2021) 65 Cal.App.5th 1145, 1164.) "Liability for intentional infliction of emotional distress ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." ' " (*Hughes*, at p. 1051.)

Schultz's threat to reveal otherwise *public information* about plaintiffs' association with the churches, together with his suggestion that plaintiffs may have committed fraud or money laundering was not — as a matter of law — so extreme and outrageous that it exceeded all bounds of that usually tolerated in a civilized community. (See *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1109.) In the absence of aggravating circumstances, insulting a person's character, implying they may have committed a crime, or

20

threatening to sue them are "not so egregiously outside the realm of civilized conduct" so as to support a claim for intentional infliction of emotional distress. (*Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1119, 1129 [referring to plaintiff as a senile liar]; *Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 342, 356 [blaming caregiver for injuring elderly patient and implying caregiver was a subpar employee]; *Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 495 [threats to initiate litigation]; compare *Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1582 [making a knowingly false report of child abuse to law enforcement was sufficient to establish probability of prevailing on claim for intentional infliction of emotional distress].)[4] Instead of grappling with these cases — or citing authority to the contrary — plaintiffs merely repeat their assertion that the trial court "improperly weighed the evidence" in determining they failed to establish a likelihood of success; again, however, plaintiffs fail to identify the evidence they claim the court improperly weighed.

The trial court also determined plaintiffs failed to establish a probability of prevailing on their cause of action for civil extortion because they offered no evidence Schultz requested or received something of value from them. In reaching this conclusion, the court relied on *Fuhrman v. California Satellite Systems* (1986) 179 Cal.App.3d 408 (*Fuhrman*), which held civil extortion — whether labeled as a claim for extortion, menace, or

---

[4] Threats of physical harm may give rise to an intentional infliction of emotional distress claim (*Delfino v. Agilent Technologies, Inc.* (2006) 145 Cal.App.4th 790, 809), but there is no admissible evidence plaintiffs perceived Schultz's comment about Lynn's deceased sister as a death threat. Plaintiffs cannot rely on the complaint's conclusory allegations to meet their burden of demonstrating a probability of success on their cause of action for intentional infliction of emotional distress. (*Barker v. Fox & Associates*, *supra*, 240 Cal.App.4th at pp. 350–351.)

duress — is "a cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution. [Citations.] It is essentially a cause of action for moneys obtained by duress, a form of fraud." (*Id.* at p. 426, disapproved on another point as stated in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 219.) *Fuhrman* held the complaint failed to state a claim for civil extortion because it did not allege the plaintiff paid "the money defendants demanded." (*Fuhrman*, at p. 426; see also *Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1171 [to establish extortion, the " 'wrongful use of force or fear must be the operating or controlling cause compelling the victim's consent to surrender the thing to the extortionist' "].) In defending the court's ruling, Schultz cites *Fuhrman*, and he reasons "a civil cause of action for extortion requires actual damages, i.e., the payment of money."

Plaintiffs do not contend *Fuhrman* is incorrectly decided, nor do they urge us to depart from its holding. Indeed, they do not discuss *Fuhrman* at all. Their cursory briefing is patently insufficient to establish the trial court erred by concluding they did not state a probability of prevailing on their cause of action for "Menace (Extortion)."[5] (*Hernandez v. First Student, Inc.*, *supra*, 37 Cal.App.5th at p. 277; *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [treating appellants' failure to respond to an argument in respondent's brief as an implicit concession of the argument's validity].) Rather than providing reasoned argument disputing the validity of the court's ruling or refuting the arguments raised by Schultz, plaintiffs

---

[5] At oral argument, counsel for plaintiffs conceded monetary consideration is an element of a claim for civil extortion. Plaintiffs do not argue California law recognizes tort claims for extortion by letter or attempted extortion, and they do not contend a cause of action for civil extortion has the same elements as the crime of extortion. Thus, we have no occasion to consider these questions.

state — in conclusory fashion in their opening brief — that they "can demonstrate a probability of prevailing on their cause of action for menace (extortion)," and they recite the definition of menace. (Capitalization omitted.) We deem this argument abandoned because plaintiffs have not explained how the evidence they submitted in opposition to the special motion to strike satisfies their burden to make a prima facie factual showing sufficient to sustain judgment in their favor on this claim. (*Monster Energy Co. v. Schechter*, *supra*, 7 Cal.5th at p. 788 [describing burden at second step of special motion to strike inquiry]; *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 616 [plaintiff provided "almost no discussion of the allegations of her complaint or the evidence accompanying her opposition"].)

Finally, the trial court determined plaintiffs failed to show a probability of prevailing on their conspiracy cause of action. In their opening brief, plaintiffs do not challenge this conclusion and we decline to consider their argument — raised in their reply brief — regarding the likelihood of success on that claim. (*Hernandez v. First Student, Inc.*, *supra*, 37 Cal.App.5th at pp. 277–278.)

In sum, we conclude the trial court properly granted Schultz's special motion to strike because plaintiffs' complaint arises out of protected petitioning activity, and they failed to show a probability of prevailing on their claims.

## DISPOSITION

The order granting Schultz's special motion to strike is affirmed. Schultz is entitled to attorney fees and costs — including those incurred in this appeal — in an amount to be determined by the trial court. (§ 425.16, subd. (c)(1); *Flickinger*, *supra*, 85 Cal.App.5th at pp. 840–841.)

23

_____

Rodríguez, J.

WE CONCUR:

_____

Tucher, P. J.

_____

Fujisaki, J.

A165581