Filed 5/28/26  Amitay v. Jews for Jesus CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ARIEL ZVOLON AMITAY,<br>        Plaintiff and Respondent,<br>v.<br>JEWS FOR JESUS,<br>        Defendant and Appellant. | A174056<br><br>(San Francisco County Super. Ct. No. CGC-24-620902) |

Ariel Amitay, an Orthodox Jewish rabbi, sued defendant Jews for Jesus (or JFJ), an evangelistic Christian ministry, for defamation and related claims based on social media postings by defendant that featured his photograph.  JFJ filed a special motion to strike the complaint under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[1]  The trial court denied the motion, finding that Amitay showed his claims had at least "minimal merit" to survive an anti-SLAPP motion.  JFJ appeals.  We find no error and affirm.

**BACKGROUND**

Jews for Jesus describes itself as an "evangelistic" ministry that "shares the Gospel of Christ to [its] Jewish brothers and sisters, both here in

---

[1] " 'SLAPP' is an acronym for 'strategic lawsuit against public participation.' "  (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*).)

the United States and around the world." According to JFJ's executive director, JFJ has expanded its "evangelistic" "outreach" to social media over the years.

In December 2023, JFJ posted on its social media pages, including on Facebook and Instagram, a blurred photograph of an Israeli soldier wearing a yarmulke. Above the photograph was the following text attributed to "Nachman": " 'Thank you for leaving at my home a copy of the New Testament. I look forward to reading it when I return home from the war' – Nachman, a young Haredi soldier."[2] [3]

Amitay filed a complaint against JFJ, attaching screenshots of JFJ's posts. He alleged that the photographs posted by JFJ were photographs of him, that they had been posted without his consent, and that defendant had defamed him, put him in a false light, and inflicted emotional distress. Amitay alleged that he was a Jewish Orthodox rabbi who had "dedicated his life to the study of the Jewish Orthodox faith and committed many years studying to become a rabbi," recounting about a dozen years of study. He had finally gotten a job teaching at an institution in Israel where he had worked for two years, a position he described as his "dream job." His job "suddenly came to an end as he was terminated . . . due to an egregious act by JFJ,"

---

[2] "Hasid is the Hebrew word for 'pious.' Hasidic Jews, or Hasidim, are the largest sub-group of Haredi Jews. Haredim are sometimes referred to as 'ultra-Orthodox,' although this term may be considered objectionable." (*Young Advocates for Fair Education v. Cuomo* (E.D.N.Y. 2019) 359 F.Supp.3d 215, 221, fn. 4.)

[3] Some of the posts went on to state: "One of the ways that God provides for His people is through the generosity of other people around the World, like you. Because of your support, we were able to give a copy of the New Testament to Nachman and more than 1,000 Israelis in 2023!"

2

namely, "upload[ing] photos of Amitay on [its] social media pages." He alleged: "JFJ posted a picture of [him] on their website giving the appearance that he supports JFJ's cause. Not only was a photo uploaded, but the post included a caption also falsely expressing that [he] supported JFJ's religious views." Amitay alleged that he is "an Orthodox Jew, a more traditional branch of Judaism, which [has] starkly different views from JFJ." He "never before associated with JFJ and disagrees with their religious views."

Amitay alleged that he had not consented to the posting or online dissemination of his photograph, and JFJ "knew or should have known from Amitay's appearance in the photo that he did not support JFJ's views." He characterized his "demeanor" in the photograph, "including his long beard and black yarmulke," as being that of a "traditional and conservative follower of Judaism, which is someone who would certainly not have supported JFJ." He also noted that he "was wearing an army outfit." He further alleged that an original photograph of Amitay had been taken by an unknown individual and posted online,[4] and "JFJ intentionally cropped the original photo to zoom in on Amitay and exclude certain objects/elements (the Tefillin) which would inform viewers he is not a JFJ supporter."[5] In addition, the original photograph (Exhibit B) depicted Amitay standing next to a person who Amitay later described in his declaration as "visibly an Orthodox Jewish rabbi."

Amitay alleged that when his employer "saw the pictures posted online," they "expressly stated that his termination was due to the posts

[4] Amitay attached a screenshot showing this original photograph to his complaint as Exhibit B.

[5] Amitay's declaration describes Tefillin as "a holy instrument that Orthodox Jews use to pray every morning."

online of him supporting JFJ, and that they could not condone or be associated with someone involved with JFJ or their views." Amitay alleged that the posts were false because Amitay "has no affiliation with [JFJ] . . . and disagrees with [JFJ's] religious views." Amitay further alleged that he "was harmed as he lost his dream job and earnings," and JFJ's "conduct was a substantial factor in causing [Amitay's] harm."

JFJ filed an anti-SLAPP motion, arguing that Amitay's claims arose from protected free speech activity and Amitay could not show a probability of prevailing on the merits. In a supporting declaration, JFJ's executive director stated that "Jews for Jesus operates openly and transparently" and "speak[s] directly . . . and publicly about who we are and why we believe that Jesus is the Jewish Messiah foretold in the Scriptures." Its "posting on social media" is "aimed at opening the door to meaningful conversations about Jesus," its "evangelistic" "outreach" on Facebook or Instagram or elsewhere is "an expression of our faith and our desire to see all people, Jewish and Gentile alike, come to know the love of God through His Son," and JFJ has "expanded [its] efforts to digital platforms because that is where people are." JFJ's chief operating officer declared that its "standard protocol" is to "blur the faces of people in [its] content" to "obscure the identity of the person in the photo so as to avoid suggesting that this individual had personally endorsed or interacted with Jews for Jesus in any way."

In opposition to the anti-SLAPP motion, Amitay submitted declarations and exhibits. Amitay declared: "I have never been associated with JFJ. I do not follow or agree with their views or beliefs, and any implication to the contrary is false." Amitay declared that he "was terminated by [his] employer" and attached the termination letter he received from his former employer, which states: "Documents (Exhibit 1 attached hereto) which, on the

4

face of it, serve as testimony to your associations with Christian bodies contrary to our Jewish faith, and to your position in the Seminary as an educator responsible for educating towards a belief in one God.  After a hearing, which did not satisfy us, we are notifying you of your immediate dismissal."[6]  Amitay declared that he has "applied for work since [his] termination from employment, but [has] been unable to secure a job."  He attached a letter from a potential employer, which states: "[H]aving heard of certain matters concerning you that have been made public, . . . we will not be able to accept you for work with us because your conduct is not in keeping with the spirit of the seminary."  Contending that JFJ "knew or should have known prior to their posting that [he] did not support their views," Amitay declared that his "long beard and black yarmulke[] were those of a traditional and conservative Orthodox Hasidic follower of Judaism."  He also declared that, in the original, uncropped photograph, he was standing next to a "visible Orthodox Jewish rabbi" and holding Tefillin, "a holy instrument that Orthodox Jews use to pray every morning."

Amitay also submitted third party declarations.  Chaim Chadad, who described himself as "a friend and acquaintance," declared: "I saw the picture and it seems that [Amitay] writes there in favor of Christianity for a non-profit organization named Jews for Jesus."  Another friend of Amitay, David Menachem Mundel Shaher, declared: "When I saw the picture of [Amitay] with a caption to the effect that he believed in a false god, I was shocked, and it is impossible to express the extent of my shock."  A rabbi in the Israeli army declared: "I saw a picture of Ariel Amitay in the [social] media, and I

_____

[6] Much of the evidence presented by Amitay, including this letter, was translated from Hebrew into English.

5

was shocked that an observant Jew would write in support of Christianity for all to see. . . . This is contrary to his role as a religious Jew . . . ."

At a hearing in June 2025, the trial court denied the anti-SLAPP motion, finding Amitay showed "there's minimal merit for all three of his claims."[7]  The trial court also concluded that both parties' evidentiary "objections were highly technical and really were unnecessary," "maybe a tiny number" of the objections "had any merit," and the parties should assume that the trial court "consider[ed] everything, particularly the Hebrew translations."[8]

JFJ appealed.

## DISCUSSION

A.    *Applicable Law and Standard of Review*

"The anti-SLAPP statute is 'designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern.  [Citations.]  To that end, the statute authorizes a special motion to strike a claim "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." ' " (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1008–1009 (*Bonni*).)

An anti-SLAPP motion involves a familiar two-step process.  "First, 'the moving defendant bears the burden of establishing that the challenged

---

[7] Amitay's cause of action for intentional infliction of emotional distress was dismissed without prejudice.

[8] JFJ sought to exclude "the entirety of [Amitay's] translated evidence" for asserted failure to comply with rules for authentication and translation of foreign language evidence.  Those objections are not raised on appeal.

6

allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni*, *supra*, 11 Cal.5th at p. 1009.)

The Supreme Court has "described this second step as a 'summary-judgment-like procedure.' [Citation.]" (*Baral*, *supra*, 1 Cal.5th at p. 384.) "The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.' [Citation.]" (*Id.* at pp. 384–385.)

We review an order denying a motion to strike under section 425.16 de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) "[A] court evaluating a probability of success should draw any nonspeculative inferences favorable to the plaintiff." (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 795 (*Monster Energy*).)

B. *Analysis*

JFJ contends the trial court erred as a matter of law in ruling that Amitay established a reasonable probability of prevailing on the merits of his defamation claim under the second step of the anti-SLAPP analysis. JFJ essentially makes two arguments: Amitay failed to state a legally sufficient cause of action for defamation, and, even if he did, he failed to meet his

7

burden of showing with admissible evidence that his claims had minimal merit.[9] We turn to each argument.

1.    Amitay Stated a Legally Sufficient Claim for Defamation

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' [Citation.]" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) "Defamation is effected by either of the following: (a) Libel. (b) Slander." (Civ. Code, § 44.) "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)

Here, Amitay has pleaded a legally sufficient claim by alleging that Amitay's employer "saw the pictures posted online"; Amitay's employer understood that the "posts online" were "of him"; Amitay's employer understood the posts to mean that Amitay was "supporting JFJ"; the posts were false because Amitay "has no affiliation with [JFJ] and . . . disagrees with [JFJ's] religious views"; and JFJ "knew or should have known from Amitay's appearance in the photo that he did not support [JFJ's] views." Amitay pleaded general damages, including "shame and embarrassment in the community," and special damages to his "profession[] or occupation" (see

---

[9] Amitay contends the trial court ruling should also be affirmed on the ground the anti-SLAPP motion fails the first prong because the speech was not made in connection with a matter of public interest. Assuming without deciding that the first prong is satisfied, we need not revisit the trial court's first step analysis because, as we shall discuss, we conclude that Amitay has carried his burden of stating legally sufficient claims and showing that his claims have at least minimal merit.

Civ. Code, § 48a, subd. (d)(2)), namely, the loss of "his dream job and earnings."[10]

In essence, JFJ argues four reasons why Amitay's pleadings were insufficient.

First, JFJ argues that Amitay failed to plead the posts were published to a third person because "Amitay does not allege that his friends or employer followed Jews for Jesus' social-media pages, and thus . . . does not allege that the Posts were communicated 'toward' his friends or employer." This argument is not persuasive. JFJ cites no authority for the proposition that a social media post is published only to followers. (*Clary v. City of Crescent City* (2017) 11 Cal.App.5th 274, 294 [" ' "This court is not required to discuss or consider points . . . which are not supported by citation to authorities . . . ." ' [Citations.]"].) In any event, the complaint alleges that Amitay's employer, Educate the Young, "saw the pictures posted online" and "stated that his termination was due to the posts online of him supporting JFJ," and that is sufficient at this stage. In assessing whether a plaintiff has met his burden at the second step of the anti-SLAPP analysis, we accept the plaintiff's factual allegations and construe them liberally. (See *Premier Medical Management Systems, Inc. v. California Insurance Guarantee Assn.* (2006) 136 Cal.App.4th 464, 476 [recognizing the standard of review for an anti-SLAPP motion is akin to that of judgment on the pleadings]; *Tukes v. Richard* (2022) 81 Cal.App.5th 1, 18 [in reviewing ruling on a motion for

---

[10] Special damages are defined by statute as "all damages that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or she has expended as a result of the alleged libel." (Civ. Code, § 48a, subd. (d)(2); see also Civ. Code, § 45a ["Special damage is defined in Section 48a of this code"].)

9

judgment on the pleadings to determine whether the complaint states a cause of action, the court accepts as true the plaintiff's factual allegations and construes them liberally].)

JFJ's second argument is that the posts "do not reference Amitay . . . by clear implication" because JFJ "blurred [his] face;" in other words, Amitay fails to sufficiently allege that the posts are of and concerning him. We disagree. In order to satisfy the "of and concerning" requirement, "the plaintiff must effectively plead that the statement at issue either expressly mentions him or refers to him by reasonable implication." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1046.) Here, as pleaded, the quote in the posts can be reasonably understood to refer to the person in the juxtaposed photograph, and Amitay has sufficiently alleged that he is the person in the photograph.

JFJ's third argument is that "[n]othing about that quote states or implies" support for "Jews for Jesus or its 'religious views.' " Again, we disagree. It is a reasonable implication that the person in the photograph provided the quote and was either endorsing JFJ's view that it was worthwhile to distribute the New Testament to people in Israel or was otherwise aiding JFJ.

JFJ's fourth argument is that Amitay failed to plead libel "per quod," which requires special damages. (See *Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 351.)[11] Here, Amitay has stated a legally sufficient claim by

---

[11] While a " 'statement . . . defamatory *on its face* . . . is said to be libelous per se, and actionable without proof of special damage,' " " 'if the defamatory character is not apparent on its face and requires an explanation of the surrounding circumstances (the "innuendo") to make its meaning clear' " then the claim is " 'defamation per quod.' " (*Barker v. Fox & Associates*, *supra*, 240 Cal.App.4th at p. 351, italics omitted.) Defamation

10

alleging that he "lost his dream job and earnings," and that his employer "stated that his termination was due to the posts online of him supporting JFJ, and that they could not condone or be associated with someone involved with JFJ or their views." JFJ's reliance on *Anschutz Entertainment Group, Inc. v. Snepp*, (2009) 171 Cal.App.4th 598, is misplaced. In that case, the plaintiffs alleged that they " 'suffered damage to their reputations in an amount to be proven at trial,' " and the court concluded that "[t]hese general allegations are insufficient to meet the specific pleading requirement." (*Id.* at p. 643.) But Amitay alleged more than mere damage to his reputation; he alleged that "he lost his dream job and earnings." That is sufficient. (See Civ. Code, § 48a, subd. (d)(2) [" 'Special damages' means all damages that plaintiff alleges . . . that he . . . has suffered in respect to his . . . profession[] or occupation . . ."].)

JFJ contends that "libel per quod requires plaintiff to plead and prove that the publisher *intended* the words to impute wrongdoing to plaintiff[,]" citing *Palm Springs Tennis Club v. Rangel*, (1999) 73 Cal.App.4th 1. However, we decline to impose an intent requirement, which is contrary to "the great weight of authority" including our own prior decision. (See *White v. Valenta* (1965) 234 Cal.App.2d 243, 257, fn. 14 [requiring the plaintiff to prove the defendant *intended* the defamatory meaning "is contrary to other cases [citations] and the great weight of authority"]; *Carl v. McDougall* (1919) 43 Cal.App. 279, 281 ["If the words were slanderous, the intention with which they were used is immaterial . . ."].) Nor is *Rosenblatt v. Baer* (1966) 383 U.S. 75, to the contrary. JFJ quotes *Rosenblatt* for the principle that "[t]here must

---

" 'per quod' " requires " 'pleading and proof of special damages.' " (*Ibid.*, italics omitted.)

11

be evidence showing that the attack was read as specifically directed at the plaintiff," but it does so out of context. Such evidence is required " 'to establish that an otherwise impersonal attack on governmental operations was a libel of an official responsible for those operations.' [Citation.]" (*Id.* at p. 81.) Thus, *Rosenblatt* cannot be said to require Amitay to prove, or plead, intent here.

      2.    <u>Amitay Made a Sufficient Showing of Defamation at the Anti-SLAPP Stage</u>

Next, JFJ contends Amitay failed to make a prima facie showing with admissible evidence to sustain a favorable judgment on his defamation claim.

As an initial matter, we address the specific evidentiary objections raised in JFJ's opening brief. Because those objections are unavailing, we reject JFJ's sweeping contention that, had the trial court sustained JFJ's objections to Amitay's declarations, "nothing would have remained to support either the 'of and concerning' requirement or the 'publication' element of Amitay's defamation claim." In its opening brief, JFJ reiterates only a few of its objections to the declarations of Chadad, Rabbi Eichel, and Shaher. For example, JFJ contends that Rabbi Eichel's statement that he "saw a picture of Ariel Amitay in the [social] media" " 'lacks foundation and is speculative as to whether the image he viewed is the same as the subject post at issue' " because he "did not identify where, when, or in what form he 'saw a picture of Ariel Amitay.' " But at this stage we draw inferences favorable to Amitay (see *Monster Energy, supra*, 7 Cal.5th at p. 795), and a reasonable inference is that Rabbi Eichel saw "a picture of Ariel Amitay in the [social] media" in one of JFJ's posts at or near the date when JFJ published the posts. JFJ's similar objections to the factual foundation of Chadad's statement that he "saw the picture and it seems that Ariel writes there in favor of Christianity"

12

and Shaher's statement that he "saw the picture of Ariel with a caption to the effect that he believed in a false god" are unavailing for the same reason. Accordingly, the trial court did not err in overruling JFJ's objections to these statements.

In its opening brief, JFJ raises hearsay and foundation objections to Amitay's statements in his declaration that "members of [his] community and [his] colleagues . . . saw the posts and informed [him] that they are shocked by the path [he] chose (associating with JFJ) and that [he] need[s] to be ashamed" and "several of [his] friends and acquaintances . . . informed [him] that they recognized [him] in the posts and criticized [his] association with JFJ and/or their views." Because these objected to statements are duplicative of other evidence, namely, non-hearsay statements in third party declarations submitted by Amitay, we need not consider the point further.

We next turn to the evidence and conclude that Amitay has shown there is at least minimal merit to his defamation claim.

First, Amitay has presented admissible evidence that JFJ made statements to third persons who reasonably understood the statements to be about Amitay. (See *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242 ["each time the defamatory statement is communicated to a third person who understands its defamatory meaning as applied to the plaintiff, the statement is said to have been 'published' "].) As we have described, Chadad declared: "I saw the picture and it seems that Ariel writes there in favor of Christianity for a non-profit organization named Jews for Jesus." Rabbi Eichel declared: "I saw a picture of Ariel Amitay in the [social] media, and I was shocked that an observant Jew would write in support of Christianity for all to see." Shaher declared: "When I saw the picture of Ariel with a caption to the effect that he believed in a false god, I was shocked, and it is

13

impossible to express the extent of my shock."  At this stage, we draw inferences favorable to Amitay (see *Monster Energy*, *supra*, 7 Cal.5th at p. 795), and the reasonable inference from each of these statements is that each of these individuals saw the picture of Amitay in one of JFJ's posts, recognized Amitay in the picture, and attributed to Amitay the words quoted ("Thank you for leaving at my home a copy of the New Testament.  I look forward to reading it when I return home from the war").

Second, Amitay has presented admissible evidence that others understood the posts to have a defamatory meaning, namely, that Amitay was supporting JFJ or its faith.  (See *Taus v. Loftus* (2007) 40 Cal.4th 683, 720 ["The tort of defamation 'involves (a) a publication that is . . . (c) defamatory . . . .' [Citation.]"]; Civ. Code, § 45 ["Libel is a . . . publication . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation"].)  Chadad declared: "[I]t seems that [Amitay] writes there in favor of Christianity for a non-profit organization named Jews for Jesus.  I . . . was surprised that an educator would speak against Judaism . . . . This is unacceptable . . . . This caused me to distance myself from him for a period . . . ."  Rabbi Eichel stated: "I saw a picture of Ariel Amitay in the [social] media, and I was shocked that an observant Jew would write in support of Christianity for all to see. . . . This is contrary to his role as a religious Jew, and it is testimony to his mental instability."  Shaher declared that he "saw the picture of Ariel with a caption to the effect that he believed in a false god" and "there is no place in the community for such a person or for his children."  (Bolding omitted.)  A reasonable inference is that Shaher understood the posts to mean that Amitay had expressed support for the evangelistic views of JFJ.

14

Third, Amitay has presented admissible evidence that the statements were false.  (See *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 470 (*Hecimovich*) ["To prevail on a claim for defamation, plaintiff must show . . . that [the statements] were false"].)  He declared: "I have never been associated with JFJ.  I do not follow or agree with their views or beliefs, and any implication to the contrary is false."

Fourth, Amitay has presented admissible evidence supporting a finding that JFJ failed to use reasonable care to determine the truth or falsity of its posts.  (See *Hecimovich*, *supra*, 203 Cal.App.4th at p. 470 ["To prevail on a claim for defamation, plaintiff must show . . . that defendants failed to use reasonable care to determine the truth or falsity"].)  Identifying "obvious" indicators of his religious beliefs, Amitay declared that his "long beard and black yarmulke[] were those of a traditional and conservative Orthodox Hassidic follower of Judaism."  He also stated that, in the original, uncropped photograph, he was holding Tefillin, "a holy instrument that Orthodox Jews use to pray every morning," and standing next to an "Orthodox Jewish rabbi."  At this stage, we infer in Amitay's favor that his long beard, black yarmulke, Tefillin, and the Orthodox Jewish rabbi standing next to him were indications of Amitay's religious beliefs.  (See *Monster Energy*, *supra*, 7 Cal.5th at p. 795.)

Fifth, Amitay has presented admissible evidence that he suffered harm to his profession or occupation.  (See Civ. Code, § 48a, subd. (d)(2).)  Amitay declared that he was terminated by his employer and has been unable to secure a job since then.

Finally, Amitay has presented admissible evidence that the posts were a substantial factor in causing his harm.  (See Civ. Code, § 45a.)  Amitay submitted the termination letter he received from his former employer, which

we have described, and which states in no uncertain terms why he was being terminated. Amitay also submitted a letter from a potential employer, which states: "[H]aving heard of certain matters concerning you that have been made public, . . . we will not be able to accept you for work with us because your conduct is not in keeping with the spirit of the seminary." Such "evidence may be considered at the anti-SLAPP motion stage if it is reasonably possible the evidence set out in supporting affidavits, declarations or their equivalent will be admissible at trial." (See *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 947.)

Thus, based on our review of the evidence presented by Amitay, we conclude, as did the trial court, that Amitay has shown that his defamation claim has at least "minimal merit" to survive an anti-SLAPP motion. We are not persuaded by JFJ's principal arguments to the contrary, which we discuss below, that: (1) Amitay failed to show the posts were "of and concerning" him as a matter of law because they do not identify him expressly or by reasonable implication; (2) no reasonable reader would understand JFJ's posts as conveying a defamatory meaning; and (3) "deciding whether Jews for Jesus harmed Amitay's reputation and standing would require the factfinder to improperly entangle itself in the tenets of Orthodox Judaism."

3. Amitay Has Not Failed As a Matter of Law to Show the Posts Were "Of and Concerning" Him

First, JFJ contends that Amitay failed to show the posts were "of and concerning" him because they do not identify him expressly or by reasonable implication. We disagree. To support its argument, JFJ principally relies on four cases, only one of which applies California law. As we shall discuss,

16

none of these cases compels the conclusion that, as a matter of law, Amitay has failed to show that the posts were "of and concerning" him.

JFJ asserts that, "if plaintiff is not named, captioned, or expressly identified in connection with the allegedly defamatory publication, then the 'of and concerning' requirement is not satisfied as a matter of law." JFJ derives this proposition principally from a Texas state court case applying Texas law and affirming summary judgment, *Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.* (Tex.App. 2007) 242 S.W.3d 518, but, there, the court suggested the opposite; for a publication to be " 'of and concerning the plaintiff,' " "[i]t isn't necessary that the plaintiff be named in the publication." (*Id.* at p. 525.) Even if we were to import principles from *Houseman* to this case, we would still conclude that Amitay has presented admissible evidence that the posts were "of and concerning" him. In *Houseman*, the defendant, a Spanish language newspaper publisher, published an article with the headline " 'Immigration Agent Accused of Drug Trafficking' " and a photograph of plaintiff Houseman working at a border check point with a police dog. (*Id.* at pp. 521-522.) The caption under the photograph stated: " 'Agent looks through the cars aided by a police dog.' " (*Id.* at p. 522.) The accused agent was named in the article; Houseman was not mentioned. (*Id.* at p. 521.) A few days later, the newspaper republished the photograph and included an explanatory note of retraction under the picture. (*Id.* at p. 522.) Plaintiff Houseman contended that the article suggested he was involved in narcotics trafficking and that he was associated with the conspiracy described in the article. (*Id.* at p. 522.) According to *Houseman*, under Texas law: "A true account that does not create a false impression by omitting material facts or suggestively juxtaposing them is not actionable, regardless of the conclusions that people may draw. [Citation.] But by omitting key

17

facts and falsely juxtaposing others, a publication may be both false and defamatory. [Citation.]" (*Id.* at p. 526.) Thus, in determining whether the "of and concerning" requirement is met under Texas law, a court reviews whether omission of material facts or suggestive juxtaposition creates a false impression. The appellate court concluded, as a matter of law, that the publication was not defamatory because a "hypothetical reasonable reader" would not be misled. (*Id.* at pp. 521, 527.) In the present case, a hypothetical reasonable reader *could* be misled, that is, a reasonable reader of one of JFJ's posts could understand that the person in the photograph, namely, Amitay, provided the quote and was either endorsing JFJ's view that it was worthwhile to distribute the New Testament to people in Israel or was otherwise aiding JFJ.

As JFJ notes, *Houseman* was distinguished by *Grimsley v. CBS Broadcasting Inc.* (D.S.C., Mar. 10, 2022, No. 2:21-CV-4008-DCN) 2022 WL 719610, a South Carolina federal district court case denying a motion to dismiss at the pleading stage. (*Id.* at p. *1.) In *Grimsley*, CBS published an article naming two deputies who had been fired in connection with the death of a mentally ill detainee. (*Ibid.*) Though plaintiff Grimsley was not one of the two named deputies, the article featured a photograph of him in uniform on a motorcycle on which his name could be seen. (*Ibid.*) Grimsley filed a complaint for defamation, and the district court denied CBS's motion to dismiss. (*Ibid.*) The district court observed that "the photo [was] zoomed in on [the plaintiff] and, in the light most favorable to Grimsley, would appear to have no relation to the article unless it was depicting one of the agents involved." (*Id.* at p. *3.) So too, here; the evidence shows that JFJ cropped the original photograph to zoom in on Amitay, and a reasonable reader of one

18

of JFJ's posts could understand that the photograph of Amitay would have no relation to the quote unless it was depicting the person quoted.

JFJ attempts to distinguish a federal case, *Manzari v. Associated Newspapers Ltd.*, (9th Cir. 2016) 830 F.3d 881, that affirmed the denial of an anti-SLAPP motion.  (*Id.* at 893.)  In *Manzari*, the defendant published an article with the headline, "PORN INDUSTRY SHUTS DOWN WITH IMMEDIATE EFFECT AFTER 'FEMALE PERFORMER' TESTS POSITIVE FOR HIV," a photograph of the plaintiff with her professional name written in neon lights, and a caption below the photograph that said: " 'Moratorium: The porn industry in California was shocked on Wednesday by the announcement that a performer had tested HIV positive.' "  (*Id.* at pp. 884, 891.)  The text of the article stated that the female performer who had tested positive for HIV " 'was not immediately identified' " and was " 'new to the industry.' "  (*Id.* at p. 884.)  The plaintiff, however, was described by the Ninth Circuit as "one of the most well-known and popular soft-core porn actresses in the world"; she had retired years earlier.  (*Id.* at pp. 884, 890.)  The Ninth Circuit held that a reasonable reader could infer that the article was about the plaintiff and that the plaintiff had presented sufficient evidence to defeat the anti-SLAPP motion.  (*Id.* at pp. 889-890.)  JFJ attempts to distinguish *Manzari* principally on "the critical fact—wholly absent here—that the 'picture includes her professional name "Danni" in neon lights behind her.' "  (Italics omitted.)  True enough.  But, in arriving at its conclusion, the Ninth Circuit examined the " 'totality of the circumstances of the publication' " and "[c]onsider[ed] the article as a whole."  (*Id.* at p. 890.)  It rejected the publisher's argument that the text of the article (in particular, that the performer at issue was new to the industry and hadn't been immediately identified) was "logically inconsistent with the inference" that

19

the plaintiff was the female performer who had tested positive for HIV.  (See *id.* at pp. 890-891.)  Here, although Amitay's name was not in neon lights, the posts' attribution of the juxtaposed quote to Nachman was not so "logically inconsistent with the inference" by a reasonable reader that Amitay was the person quoted in JFJ's posts.  (See *ibid.*)  JFJ's chief operating officer's declaration in effect acknowledged that "blur[ring] the faces of people in [its] content" was necessary because juxtaposing a person's photograph with content might "suggest[] that this individual had personally endorsed or interacted with JFJ."  But a reasonable reader seeing Amitay's blurred face in JFJ's posts could infer that Amity was the source of the quote, as Amitay's evidence showed here.  At this stage, the reference to Nachman does not negate that reasonable inference.

JFJ attempts to liken this case to a federal case, *CoreCivic, Inc. v. Candide Group, LLC*, (9th Cir. 2022) 46 F.4th 1136, an anti-SLAPP appeal in which the Ninth Circuit held, among other things, that plaintiff CoreCivic, an operator of detention centers, had failed to "plausibly plead" a defamation by implication claim under the pleading standards of Federal Rule of Civil Procedure 12(b)(6).  (*Id.* at pp. 1138, 1143.)  JFJ contends that, "as in *CoreCivic*, the image [of Amitay] simply served as a 'visual component' to Jews for Jesus' message about distributing copies of the New Testament."  But the quoted term, "visual component," comes from the declaration of JFJ's chief operating officer, not the Ninth Circuit.  And the facts in *CoreCivic* are simply too dissimilar for the case to be instructive.  In *CoreCivic*, the photograph was not even of plaintiff CoreCivic.  (*Id.* at pp. 1145, 1139.)  Here, the photograph is of Amitay himself.  Because the facts in *CoreCivic* are nothing like this case, *CoreCivic* does not persuade us that Amitay failed to show the posts were "of or concerning" him as a matter of law.

20

Finally, JFJ contends that its posts cannot be "of and concerning" Amitay because they expressly identify the speaker as "Nachman." But a statement can be "of and concerning" a plaintiff even if attributed to a fictitious name. (See *Bindrim v. Mitchell* (1979) 92 Cal.App.3d 61, 75, disapproved of on other grounds by *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835 ["We cannot say . . . that no one who knew plaintiff . . . could reasonably identify him with the fictional character [in the book]. Plaintiff was identified as [the fictional character] by several witnesses . . .".)  Here, Amitay's evidentiary showing in support of his defamation claim does not fail as a matter of law just because JFJ attributed the quote in the posts to a fictitious name.

4.      A Person Could Reasonably Understand the Posts' Defamatory Meaning

JFJ contends that, as a matter of law, no reasonable reader would read its posts as conveying a defamatory meaning. For this argument, JFJ relies on *Hoang v. Tran* (2021) 60 Cal.App.5th 513. But *Hoang* is distinguishable. In *Hoang*, one of the defendants posted an article about the plaintiff on Facebook that was republished on the " 'BBC Vietnamese Facebook Page.' " (*Id.* at p. 521.) The article stated that " '[s]ince the [19]90s, [the plaintiff] has flown to Shanghai, imported blood from China, then provided it to a number of large hospitals in the U.S., and he has thereby become a "billionaire".' " (*Ibid.*)  The plaintiff sued the author of the article, BBC Global News, and other defendants. (*Id.* at p. 520.) Applying the totality of circumstances test to one of the allegedly defamatory statements, the court recited the principle that " ' "[t]he fact that some person might, with extra sensitive perception, understand such a [defamatory] meaning cannot compel this court to establish liability at so low a threshold." ' [Citation.]" (*Id.* at p. 520.) JFJ

21

relies on *Hoang* for that particular principle, but omits the sentences that immediately precede and follow the quoted statement. The court also stated: "The article 'must be viewed from the perspective of the average reader of [the BBC Vietnamese Facebook Page], not . . . [an] expert [on the global blood trade] who might view [it] as conveying some special meaning . . . .' [Citation.] The average reader of the BBC Vietnamese Facebook Page would not know that the export of blood from China to the United States was illegal." (*Id.* at p. 533.) The court concluded that the trial court should have granted the anti-SLAPP motion. (*Id.* at p. 520.)

Here, we can reasonably infer from the evidence presented that the audience to whom posts by the "Jews for Jesus Israel" account were directed included people in Israel, and no extra sensitive perception or expertise would be required to infer a defamatory meaning from JFJ's juxtaposition of Amitay's photograph with the quote in the posts. Whether that could be proven at trial is another question, but, at this stage, Amitay's defamation claim has at least the minimal merit required to survive an anti-SLAPP motion.

5.      JFJ Waived Its Improper Entanglement Argument

JFJ contends for the first time on appeal that "deciding whether Jews for Jesus harmed Amitay's reputation and standing would require the factfinder to improperly entangle itself in the tenets of Orthodox Judaism." "As a general rule, 'issues not raised in the trial court cannot be raised for the first time on appeal.' [Citation.]" (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417.) "Thus, 'we ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived. [Citations.]' " (*Newton v. Clemons* (2003) 110 Cal.App.4th

22

1, 11.)  We see no reason here to depart from the general rule here.  We conclude that JFJ waived this contention for purposes of its anti-SLAPP motion.

Even if we considered JFJ's untimely argument, the argument is not persuasive.  JFJ principally relies on *Abdelhak v. Jewish Press Inc.*, (N.J.Super.Ct.App.Div. 2009) 411 N.J.Super. 211, a case easily distinguishable.  In *Abdelhak*, a trial court in New Jersey granted the defendants' motions to dismiss for lack of subject matter jurisdiction because "adjudication of plaintiff's claims would require the court and jury to make no less than eleven determinations regarding questions grounded in religious doctrine[.]"  (*Id.* at p. 221.)  The appellate court affirmed because the "excessive entanglement that the Founders sought to avoid is squarely presented" where, "as here, a jury cannot evaluate plaintiff's defamation claim without developing a keen understanding of religious doctrine, and without applying such religious doctrine in a fact-sensitive and nuanced fashion."  (*Id.* at p. 233.)  *Abdelhak* is inapposite here, where JFJ has not contended, in the trial court or on appeal, that the trial court lacked subject matter jurisdiction.

For the same reason, JFJ misplaced its reliance on *Klagsbrun v. Va'ad Harabonim of Greater Monsey* (D.N.J. 1999) 53 F.Supp.2d 732, affd. *sub nom. Klagsbrun v. Vaad Harabonm of Greater Monsey* (3d Cir. 2001) 263 F.3d 158, and *Goodman v. Temple Shir Ami, Inc.* (Fla.Dist.Ct.App. 1998) 712 So.2d 775.  (See *Klagsbrun, supra,* 53 F.Supp.2d at p. 742 [dismissing action for lack of subject matter jurisdiction because "the plaintiff's defamation claims raise inherently religious issues" and "are therefore not properly cognizable in this court"]; *Goodman, supra,* 712 So.2d at p. 776 [affirming the trial

23

court's dismissal of a defamation claim for lack of subject matter jurisdiction].)

### 6. Amitay's Other Claims Do Not Necessarily Fail

JFJ contends that, "[b]ecause Amitay's defamation claim fails as a matter of law, his derivative claims necessarily collapse as well." Because we conclude that Amitay's defamation claim does not fail as a matter of law, we reject JFJ's three sentence argument that Amitay's other claims necessarily fail.

## DISPOSITION

The challenged order is affirmed. Amitay shall recover his costs on appeal.

_____

Miller, J.

WE CONCUR:

_____

Richman, Acting P. J.

_____

Desautels, J.

A174056, *Amitay v. Jews for Jesus*